EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* EDUARDO RIVERA CARMONA, acusado y apelante.

*Número:* CR-78-11        *Resuelto:* 27 de junio de 1979

*José A. Andreu García* y *Manuel E. Andreu García,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Justo Gorbea Varona, Procurador General Auxiliar,* abogados de El Pueblo.

SENTENCIA

El apelante Eduardo Rivera Carmona—acusado de asesinato en primer grado, tentativa de asesinato e infracción al Art. 8 de la Ley de Armas—fue declarado culpable por un jurado de asesinato en segundo grado, tentativa de homicidio y de violar el precepto de la Ley de Armas antes referido.

Sentenciado a cumplir respectivamente—de manera con-currente—penas de presidio de 15 a 20 años en el asesinato y de 3 a 5 años en los restantes delitos, no conforme, plantea y discute ante nos los errores que a continuación examinaremos separadamente.

*Primero*: "El veredicto de culpabilidad por el delito de Asesinato en Segundo Grado rendido por el Jurado en la causa G-77-1418 es contrario a la evidencia desfilada en estos casos."

La tesis del apelante es en el sentido de que la evidencia demostró un homicidio voluntario pues entre él y el occiso —quien tenía 0.25% de alcohol en la sangre—se entabló una discusión acalorada que debió crear una duda fundada y razonable en torno al elemento de malicia premeditada. Para robustecer su contención destaca que el delito de homicidio voluntario resulta ser el único consistente con el de tentativa de homicidio rendido por el jurado, como parte de los mismos hechos.

El planteamiento es improcedente. La prueba del Minis-terio Fiscal—a quien el jurado le dio entero crédito—estableció que el apelante le dio muerte a Esteban Roberto Pérez Díaz con malicia premeditada y deliberada. En síntesis, demostró que próxima a la media noche del 31 de diciembre de 1976, el occiso Roberto Pérez, acompañado de otros amigos, llegó a la residencia de Ana Becerra Ifragil con una parranda navideña y de despedida de año. Al poco rato llegó el apelante quien desde hacia algún tiempo sostenía relaciones amorosas e íntimas con dicha dama. Tanto el apelante como el occiso habían hecho uso excesivo de bebidas alcohólicas. Después de un rato, el occiso se dispuso a marcharse y subió a su automóvil, pero a requerimiento del apelante se bajó del mismo y ambos subieron a la segunda planta para despedirse. Se suscitó una discusión entre el apelante y el occiso, pues éste no quería entrar al cuarto donde estaba Ana, y el apelante insistía golpeando la puerta de dicha habitación con patadas y puños. La testigo Becerra narra el incidente así:

"Que primero subió Roberto la escalera de la segunda planta y después Eduardo. Que Gladys y la niña Amina, ya estaban en su cuarto. Que ella cogió miedo y se fue para el cuarto de Gladys y tiró cerrojo. Que cogió miedo por la forma en que Eduardo y Roberto venían discutiendo. Que como ella no quería abrir la puerta, Eduardo le entró a patadas y puñetazos a la misma y que le gritaba 'abre, abre' insistentemente, pero ella no quería abrir porque tenía miedo con el revolú, según ella, que se había formado en el pasillo. Ella, a insistencias de Gladys abrió la puerta. Que Gladys se quedó metida en el closet. Que al abrir la puerta entra Eduardo y Roberto se quedó detrás de éste. Que ella abrió e inmediatamente corrió hacia la cama. Que entró Eduardo y Roberto se quedó en la puerta, *que ahí Eduardo saca el revólver y le dispara a Roberto cuatro disparos consecutivos*. Que ella no podía ver a Roberto porque quedaba detrás. *Que ahí inmediatamente se viró hacia ella y le disparó dos disparos, que eso fue enseguida, rápido, que la puerta se mantenía abierta.* Que cuando esto pasaba, ella se encontraba como a quince pies retirada de Eduardo. Que ahí le disparó cuatro disparos a Roberto violentamente encolerizado y que decía: 'si no quieres a un negro, tampoco no quieres a un blanco'." (E.N.P., pág. 18.) (Énfasis nuestro.)

La versión del apelante es radicalmente distinta, atribuyéndole a la víctima la idea de subir a despedirse de Ana y de que actuó en defensa propia al defenderse de los ataques con una "faca" que portaba el occiso.

Coincidimos con el Procurador General en torno al siguiente análisis:

"Como podemos apreciar la prueba es que la ira del apelante era contra Ana quien no le quería abrir la puerta y a quien le dijo 'si no quieres a un negro, tampoco quieres a un blanco', pero contra su víctima no tenía coraje, y no tenía porqué tenerlo, pues éste lo que había hecho era complacerlo, ir a 'despedirse' de Ana. La agresión contra Roberto (la víctima) se llevó a cabo más bien como un desquite del apelante contra Ana por un absurdo e inexplicable coraje que aparentemente se produjo porque Ana no le quería abrir la puerta, (E.N.P., Pág. 36) o porque no quería 'despedirse', o porque no quería al apelante. Véase *López Rodríguez*, supra, a la página 899 donde este Honorable Tribunal convino con el razonamiento del Procurador General. Esto explica porqué el jurado rindió un veredicto de asesinato en segundo grado, que a nuestro

entender debió ser en primer grado, y otro de tentativa de Homicidio en el caso de Ana. Pero aún en el caso de Ana la mera ira o cólera por más violenta que ésta sea no reduce el delito, pues ésta debe ser un 'arrebato de cólera' y en el caso de autos los hechos no demuestran ese 'arrebato de cólera'. Para que la provocación reduzca el delito de asesinato a homicidio voluntario tiene que ser aquella de tal naturaleza que haga perder el dominio de sí mismo a un hombre de temperamento corriente obligándolo a actuar por el impulso producido por notable provocación, sin la debida reflexión *y sin formar un determinado propósito, Pueblo* v. *López Rodríguez,* supra, 101 D.P.R. 897, 898 y casos allí citados.

Aquí como hemos dicho los hechos demuestran que el apelante tenía el propósito de matar a Roberto y a Ana. Ese propósito lo logró en cuanto a Roberto pero no en cuanto a Ana a quien solamente hirió. Tampoco existe aquí prueba creída por el Jurado de provocación alguna al menos por parte de Roberto, cuyo único error fue apearse de su automóvil para despedirse de Ana a instancias del apelante." (Informe, págs. 8–9.)

.         .         .         .         .         .         .         .

"No puede inferirse del hecho de ocupársele a la víctima en su mano izquierda una faca la versión del apelante sobre defensa propia; lo que sí podemos inferir es que la víctima pudo tratar infructuosamente defenderse de la agresión del apelante. La víctima ni siquiera logró herir al apelante, éste salió ileso.

A nuestro juicio la prueba presentada en este caso demuestra la culpabilidad del apelante fuera de toda duda razonable de los delitos por los cuales fue acusado y que los veredictos rendidos por el jurado son correctos. El conflicto en la prueba fue debidamente dirimido por el jurado. No existe base en el récord para alterar esa determinación, *Pueblo* v. *Rodríguez Polanco,* [106 D.P.R. 228 (1977)]; *Pueblo* v. *Díaz Díaz,* [107 D.P.R. 140 (1978)]. Este Honorable Tribunal ha resuelto reiteradamente que no intervendrá con la apreciación de la prueba por parte del juzgador de los hechos, excepto cuando se demuestra claramente la existencia de pasión, prejuicio o error manifiesto de su parte. *Pueblo* v. *Colón Obregón,* 102 D.P.R. 364 (1974); *Pueblo* v. *Ledée Ramírez,* 102 D.P.R. 679 (1974); *Pueblo* v. *Cruz Negrón,* 104 D.P.R. 881 (1976)."

*Segundo*: "La conducta del Juez Sentenciador, al intimidar al abogado del acusado en presencia del Jurado al efecto de que no debía hacer objeción alguna durante el resto del proceso y adelantarle que habría de castigarlo por desacato, privó al acusado de un juicio

justo e imparcial en violación de la garantía constitucional del debido proceso de Ley."

El apelante no tiene razón. El incidente—que ocurre después de haberse desfilado toda la prueba, durante el turno de informe al jurado—se desarrolló del siguiente modo:

"HON. JUEZ:

Sin lugar la objeción. Continúe el señor Fiscal.

LCDO. RUIDÍAZ:

Perdón, si hubiera el revólver no, 'un revólver'. Y me refiero al récord que fue lo que dijo.

HON. FISCAL:

Vamos a cambiar 'un' por 'el'.

LCDO. RUIDÍAZ:

Hay mucha diferencia.

HON. JUEZ:

Colega, y hágame el favor ya hizo el señalamiento y se dirige al Tribunal, no quiero más discusión.

LCDO. RUIDÍAZ:

*Voy a permanecer callado y no voy a decir nada. Voy a permanecer callado, no voy a hablar más, Vuestro Honor.*

HON. JUEZ:

*Mire, antes de que se termine este proceso el compañero me va a responder a mí por desacato. Y no se le ocurra levantar una palabra más. Así que haga buena su palabra, que no se va a levantar más a protestar.*" (Énfasis nuestro.)

Notamos que quien se toma la iniciativa y decide adoptar una postura pasiva de "permanecer callado, no voy a hablar más" es el letrado Ruidíaz, habiendo simplemente el tribunal apercibídole de un desacato y de que hiciera "buena su palabra". El incidente no tiene la trascendencia de perjuicio que se le atribuye. Así lo intimamos en nuestra Sentencia dictada en la apelación sobre este desacato, caso Cr-77-133, *Pueblo de Puerto Rico* v. *Máximo Ruidíaz*, fechada 18 de abril de 1978:

"A la luz de la transcripción de evidencia estamos convencidos de que *se trata de un caso fronterizo* en que la sentencia debe ser revocada.

Del dictamen reproducido notamos que se trata de un incidente

aislado, producto de un exabrupto del apelante motivado por una discrepancia en cuanto a la resolución de unas objeciones. Más bien representa una falta de estilo y de paciencia, censurable en un abogado, que la falta de respeto realizada con el propósito de perturbar el orden, causar ruido o disturbio o desdeñosa o insolentemente interrumpir los procedimientos judiciales, situaciones contempladas en el artículo 235 del Código Penal vigente, 33 L.P.R.A. sec. 4431. Distinta decisión se impondría, de surgir del récord una conducta repetida y reiterada, de naturaleza análoga. *Pueblo* v. *Báez*, 72 D.P.R. 175, 181 (1951). A pesar de que revocamos la sanción económica, *consideramos en orden una advertencia al abogado sobre la necesidad de buenos modales para preservar el clima de dignidad y reposo en que debe desarrollarse el juicio.*" (Énfasis nuestro.)

Si el incidente hubiese continuado, el procedimiento correcto hubiese exigido que fuera ventilado en ausencia del jurado. Así notamos que el tribunal sentenciador, consciente de ello pospone para otra ocasión—no estando presente el jurado—el trámite sobre desacato sumario. Reiteramos, que el incidente no tiene las proporciones pretendidas. Véanse *Pueblo* v. *Figueroa González*, 95 D.P.R. 98, 107–108 (1967); *Pueblo* v. *Díaz*, 74 D.P.R. 375, 394, 396 (1953).

*Tercero*: "Incidió el Tribunal Sentenciador al transmitir a los miembros del Jurado una instrucción sobre la supuesta huida del acusado cuando la evidencia desfilada en este caso no justificaba tal instrucción, ocasionando de tal modo, grave perjuicio al acusado."

El apelante cuestiona la instrucción dada al jurada sobre huida consignada en la pág. 30 del *Libro de Instrucciones al Jurado para el Tribunal Superior de Puerto Rico*, a base de que la prueba no la justificaba.

Discrepamos. La evidencia producida por los testimonios de Gladys Hernández Pérez—quien testificó que el apelante salió corriendo inmediatamente hacia abajo, (E.N.P., pág. 10); Ana Becerra Ifragil—quien atestó que al caer herida al piso se hizo la muerta, notó que el apelante se metió el revólver en la cintura y se fue corriendo rápidamente por las escaleras (E.N.P., pág. 14); y su hija Amina Ifragil Becerra— quien declaró, refiriéndose al apelante, que escuchó que

alguien bajaba las escaleras rápidamente corriendo (E.N.P., pág. 21) justificaba tal instrucción.

El propio apelante admitió que después de dos disparos se fue del lugar inmediatamente hacia su casa y mandó a buscar a su cuñado, el policía José Manuel Couvertier. Estos hechos establecen que el apelante huyó inmediatamente de la escena del crimen; se dirigió a la casa de su mamá donde estaba su esposa; de ahí es llevado por su cuñado, el agente Couvertier, al Cuartel de la Policía de Hato Rey. En estas circunstancias no se cometió error al impartirse la siguiente instrucción:

> "La huida o fuga es una circunstancia, *de entender ustedes que ha sido probada*, para ser apreciada y ponderada como tendiente, en algún grado, a demostrar un sentimiento de culpabilidad. El Tribunal enfatiza que dicha prueba por sí sola *no* es suficiente para establecer la culpabildad del acusado. Es de la estricta incumbencia de ustedes el determinar su alcance así como el peso que merezca considerando todas las circunstancias que concurren en el caso." (Énfasis nuestro.)

Como afirma el Procurador General, "[e]l Tribunal de Instancia dejó al jurado la determinación, de si se había probado la huida a base de los hechos; o sea, si la forma en que se ausentó del sitio de los hechos el apelante y luego su entrega voluntaria en el Cuartel de la Policía constituía una huida. Véase *Pueblo* v. *Delgado La Fuente*, 97 D.P.R. 266, 268–269 (1969) y *Pueblo* v. *Hernández Soto*, 99 D.P.R. 768, 776–777 (1971).

"Además, el apelante no objetó la aludida instrucción ni solicitó instrucción especial al respecto, por lo que resulta tardío su planteamiento. *Pueblo* v. *del Valle*, 91 D.P.R. 174, 179 (1964). Tanto la prueba de cargo como la de defensa daban margen a que se transmitiera al jurado la instrucción sobre fuga en la forma que lo hizo el Tribunal de instancia."

> *Cuarto*: 'La pena indeterminada de 15 a 20 años de presidio impuesta al apelante en el caso de Asesinato en Segundo Grado, aunque legal, resulta excesiva a tenor con los hechos y circunstancias presentes en este caso."

El señalamiento—que no ataca la legalidad de la pena dentro de los límites establecidos—va dirigido a la discreción del Tribunal al imponer la misma. No intervendremos con el discernimiento de dicho foro.

Se confirma la sentencia.

Así lo pronunció y manda el Tribunal y certifica el Señor Secretario. El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente a la cual se une el Juez Presidente Señor Trías Monge.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—O—

Opinión disidente del Juez Asociado Señor Irizarry Yunqué a la cual se une el Juez Presidente Señor Trías Moñge.

San Juan, Puerto Rico, a 27 de junio de 1979

Disiento por entender que se cometió el error señalado en el segundo apuntamiento y que ello debe motivar la revocación de las sentencias apeladas.

El incidente a que este señalamiento se refiere fue la culminación de varios incidentes anteriores que reflejan algo muy común durante la ventilación de juicios criminales, particularmente aquellos celebrados ante jurado. Abogados y fiscales son vehementes en sus planteamientos de derecho, se formulan y se resuelven objeciones en un ambiente tenso, y los ánimos de todos, incluyendo a veces al propio juez, se van caldeando. Esto es particularmente así en casos por asesinato en primer grado, delito que apareja mandatoriamente la pena de reclusión perpetua, máximo castigo que puede imponerse a un acusado en esta jurisdicción.

Aquí se imputaba al apelante un asesinato en primer grado, una tentativa de asesinato y una infracción del Art. 8 de la Ley de Armas, por hechos ocurridos la noche del 31 de diciembre de 1976 al 1 de enero de 1977. Con motivo de la despedida de año, Roberto Pérez Díaz visitó la casa de Ana

Becerra para llevarle una parranda. Al rato llegó Eduardo Rivera Carmona, ahora apelante, quien mantenía relaciones amorosas íntimas con Ana. Tanto Roberto Pérez Díaz como Eduardo Rivera Carmona estaban tomados. Pérez Díaz, quien advino occiso poco después, tenía una concentración de 0.25% de alcohol en la sangre. El apelante, según el testimonio de Ana, estaba borracho. A instancias del apelante, ambos subieron a la casa y en su segunda planta se suscitó entre ellos una discusión que catalogó Ana de acalorada, de que se formó un "revolú". A continuación su narración del incidente, que tomo de la ponencia del Tribunal:

"Que primero subió Roberto la escalera de la segunda planta y después Eduardo. Que Gladys y la niña Amina, ya estaban en su cuarto. Que ella cogió miedo y se fue para el cuarto de Gladys y tiró cerrojo. Que cogió miedo por la forma en que Eduardo y Roberto venían discutiendo. Que como ella no quería abrir la puerta, Eduardo le entró a patadas y puñetazos a la misma y que le gritaba 'abre, abre' insistentemente, pero ella no quería abrir porque tenía miedo con el revolú, según ella, que se había formado en el pasillo. Ella, a insistencias de Gladys abrió la puerta. Que Gladys se quedó metida en el closet. Que al abrir la puerta entra Eduardo y Roberto se quedó detrás de éste. Que ella abrió e inmediatamente corrió hacia la cama. Que entró Eduardo y Roberto se quedó en la puerta, *que ahí Eduardo saca el revólver y le dispara a Roberto cuatro disparos consecutivos.* Que ella no podía ver a Roberto porque quedaba detrás. *Que ahí inmediatamente se viró hacia ella y le disparó dos disparos, que eso fue enseguida, rápido, que la puerta se mantenía abierta.* Que cuando esto pasaba, ella se encontraba como a quince pies retirada de Eduardo. Que ahí le disparó cuatro disparos a Roberto violentamente encolerizado y que decía: 'si no quieres a un negro, tampoco no quieres a un blanco'." (E.N.P., pág. 18) (Énfasis nuestro.)

El apelante alegó defensa propia. Su testimonio fue al efecto de que se vio precisado a disparar contra Pérez Díaz, estando en ese momento Ana en el pasillo, para repeler la agresión de éste mientras avanzaba sobre él armado de una cuchilla. La prueba de cargo estableció que el agente Víctor M. París, quien esa misma noche se personó a la casa de Ana a

investigar los hechos luego de recibirse una llamada telefónica en el cuartel, al examinar el cadáver del occiso le ocupó "una cuchilla faca en su mano izquierda; la cual él le quitó fácilmente ya que la mano con la que tenía empuñado el mango de la curva estaba flágil [*sic*]." Aseguró que la tenía "con la mano cerrada en la izquierda, de la cual él la sacó."

El jurado rindió veredicto de asesinato en segundo grado por la muerte de Pérez Díaz, tentativa de homicidio por la agresión a Ana, y culpabilidad por la portación ilegal del arma homicida.

Los autos revelan que el juicio se desarrolló en ambiente de tensión. Comenzó el 19 de septiembre de 1977 y se extendió hasta el 30 de dicho mes y año, en que se produjeron los veredictos condenatorios. Contra el abogado del apelante ([1]) se suscitaron dos incidentes por desacato, resueltos ambos el 30 de septiembre, después de retirarse el jurado a deliberar. En uno se le imputó "no haber comparecido a la hora, según se le había indicado por el Tribunal", y se le absolvió a base de darle "el beneficio de la duda." (Minuta del 30 de septiembre de 1977.) El otro es el que motiva el señalamiento de error que comentamos ahora, por el cual se le declaró culpable y se le sentenció a pagar $200 de multa o a cumplir un día de cárcel por cada cinco dólares que dejara de pagar. Esta sentencia fue revocada por nosotros el 18 de abril de 1978 (caso Cr-77-133).

Examinemos este segundo incidente. Surgió mientras el fiscal consumía su informe al jurado. Una enmienda propuesta a la exposición narrativa de la prueba señala que se produjo este incidente luego de objetar el abogado defensor el argumento del fiscal de que la faca ocupada en la mano cerrada del occiso fue puesta allí por el apelante para fabricar un caso de defensa propia. La objeción fue desestimada por el juez sentenciador "aduciendo en presencia del jurado que la evidencia presentada justificaba la inferencia hecha por el Fiscal [*sic*] en tal sentido."([2])

El incidente que entonces se produjo fue como sigue:

"LCDO. RUIDÍAZ:

Que diga la parte que estaba fuera del . . . porque eso es importante que el jurado, no la parte afuera y la otra, eso desvirtúa todo lo que se ha dicho aquí.

HON. JUEZ:

El jurado va a resolver, tiene como prueba la fotografía, el cuerpo aparece completo dentro del cuarto, el jurado considerará eso, es evidencia en el caso.

LCDO. RUIDÍAZ:

Objetamos la forma del informe al jurado, está comentando la técnica usada por la defensa para contrainterrogar los testigos, lo cual entendemos que lo que puede traer es más confusión en la mente del jurado.

HON. JUEZ:

Sin lugar la objeción. Continúe el señor fiscal.

LCDO. RUIDÍAZ:

Perdón, si hubiera el revólver no, 'un revólver'. Y me refiero al récord qué fue lo que dijo.

HON. FISCAL:

Vamos a cambiar 'un' por 'el'.

LCDO. RUIDÍAZ:

Hay mucha diferencia.

HON. JUEZ:

Colega, y hágame el favor, ya hizo el señalamiento y se dirige al Tribunal, no quiero más discusión.

LCDO. RUIDÍAZ:

Voy a permanecer callado y no voy a decir nada. Voy a permanecer callado, no voy a hablar más, Vuestro Honor.

HON. JUEZ:

Mire, antes de que se termine este proceso el compañero me va a responder a mí por desacato. Y no se le ocurra levantar una palabra más. Así que haga buena su palabra, que no se va a levantar más a protestar." (T.E., págs. 2–4.)

El caso fue sometido al jurado para su deliberación a eso de las 4:40 de la tarde. Alrededor de las 6:10 regresó el jurado a sala para solicitar instrucciones adicionales sobre la tentativa de asesinato. La exposición narrativa señala lo siguiente, pág. 34:

". . . En este incidente el Juez solamente dijo en términos generales lo siguiente: De entender que se había cometido un delito

pero si tenían duda entre tentativa de asesinato y tentativa de homicidio era el deber del Jurado darle el beneficio de la duda, rindiendo un veredicto por delito menor si hay esa duda, debe ser el veredicto tentativa de homicidio."

"No por haberse expresado en innumerables ocasiones debe dejarse de repetir, que uno de los derechos más preciados que tiene el ciudadano en nuestra comunidad es que cuando se le acusa de delito se le juzgue en tales circunstancias que el proceso que se le celebre esté rodeado de todas las garantías que hacen posible un juicio justo." Así se expresó este Tribunal en *Reyes* v. *Tribunal Superior*, 84 D.P.R. 29, 37 (1961), palabras que reiteró en *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492, 499 (1962), y que tendrán vigencia mientras perduren el derecho a un juicio justo e imparcial y el principio de que todo acusado se presume inocente y su culpabilidad deberá probarse más allá de duda razonable. Esencial a la salvaguarda de esos principios es el derecho del acusado a estar asistido eficazmente de abogado durante todas las etapas del juicio.

Se ha resuelto en diferentes jurisdicciones estatales estadounidenses que la amonestación o reprimenda a un abogado, hecha en presencia del jurado, aun cuando no se le castigue por desacato, constituyen una privación del derecho del acusado a un juicio justo y a estar efectivamente asistido de abogado. Véanse *Dale* v. *State*, Okl. Cr., 441 P.2d 476, 477 (1968); *State* v. *Collins*, S.C. Washington, 400 P.2d 793, 795 (1965); *People* v. *Bedard*, 1 Ill.2d 622, 145 N.E.2d 54, 57 (1957); *People* v. *Rodríguez*, 32 App. Div.2d 545, 299 N.Y.S.2d 632; 3 Wharton's *Criminal Procedure*, 21a. ed., sec. 485, pág. 353. Se señaló en *Dale*, supra, que "reprender al abogado de un acusado en presencia del jurado es altamente perjudicial. Si la conducta del abogado es impropia la corte debe excusar al jurado antes de impartir una reprimenda o de amenazar con castigarle con multa o prisión por descato." Esto constituye error perjudicial que justifica revocar, particularmente en presencia de 'prueba punzantemente conflictiva' (*evidence sharply conflicting*). *Dale*, supra, pág. 478.

La misma doctrina se ha seguido en la jurisdicción federal. Se resolvió en *United States* v. *Coke*, 339 F.2d 183, 185 (2nd Cir. 1964), que aun en el caso de una reprimenda merecida por el abogado, debe hacerse fuera de la presencia del jurado para que no se prive al acusado de su derecho a un juicio justo. En *United States* v. *Kelley*, 314 F.2d 461, 463–464 (6th Cir. 1963), bajo una situación parecida a la que consideramos, se resolvió que una amonestación al abogado del acusado para que dejara de sonreír y señalar con el brazo hacia el jurado, so pena de desacato, hecha en presencia de dicho cuerpo, y la subsiguiente censura por conducta que el juez insinuó era antiética, constituyeron error perjudicial en violación del derecho del acusado a un juicio justo.

El tratamiento adverso que un juez dé a un abogado defensor ante el jurado prejuicia a éste en contra del acusado. Rothblatt, *Prejudicial Conduct of the Trial Judge in Criminal Cases*, 2 Criminal Law Bulletin 3 (1966); Nota, *Judicial Intervention in Trials*, 1973, Wash. U.L.Q. 843, 852. En el ámbito federal se considera que las amonestaciones que el juez haga al abogado defensor constituyen un fundamento para un nuevo juicio si éstas operan para privar al acusado de un juicio justo e imparcial, ya sea porque le privan de asistencia legal efectiva o porque influyen al jurado y crean en éste prejuicios en su contra. *Bursten* v. *United States*, 395 F.2d 976, 983 (1968); *Johnson* v. *United States*, 356 F.2d 680, 683 (1966).

No veo razón alguna para que esas normas no apliquen en nuestra jurisdicción, donde rigen los mismos principios constitucionales invocados en los citados casos, sentados sobre la premisa específicamente articulada en la Carta de Derechos de nuestra Constitución como base esencial de nuestro sistema de impartir justicia, de que la dignidad del ser humano es inviolable. Nada puede repugnar más a la dignidad del ser humano que privarlo injustamente de su libertad. Nuestro sistema establece normas procesales de fundamental importancia como parte del debido proceso de ley para salva-

guardar el derecho de toda persona acusada de delito a que se le celebre un juicio justo e imparcial. Esas normas, para ser efectivas, han de ser aplicadas con rigurosidad.

Es difícil señalar en qué casos un incidente como el que aquí consideramos puede haber afectado el derecho a un juicio justo. Tal determinación ha de basarse en consideraciones subjetivas. No se ha descubierto el medio que permita penetrar la mente de cada jurado para hallar el por qué de su fallo. Pero sabemos que hay incidentes que influyen y fácilmente pueden desviar el razonamiento u obnubilar la deliberación de forma tal que se impida aflorar la duda razonable que pueda haber conciencia adentro. ¿Cómo armonizar en este caso el veredicto de asesinato por la muerte de Roberto Pérez Díaz con el de tentativa de homicidio en la persona de Ana Becerra?

Los hechos del caso nos presentan una discusión agria entre dos personas ebrias, con unas faldas de por medio, que culminan en la muerte de uno y en que la mujer resulta herida de bala. El acusado hizo uso de un arma de fuego. El cadáver del occiso, aun fláccido, empuñaba en su mano izquierda una cuchilla tipo faca. El incidente ocurre en un pasillo en un segundo piso, frente al dormitorio en que estaba la mujer. No hay prueba de cómo comenzó la discusión entre los dos hombres, aunque sí de que era acalorada. Ana y su hija estaban encerradas por temor. Los testigos señalan que el acusado salió corriendo inmediatamente después de los disparos. Esto motivó una instrucción al jurado sobre el alcance de la "huida" como prueba circunstancial incriminatoria. ¿Es esto compatible con la fría calculación insinuada por el fiscal de poner la faca en el puño del occiso antes de la llamada huida?

La condición humana es frágil, sobre todo la de las personas sencillas y humildes, como son la mayoría de las que actúan como jurados. La inclinación que el juez pueda tener con respecto a la adjudicación de los hechos, si conocida del jurado, tiene un enorme peso en su decisión. Ellos desconocen

los intrincados problemas sobre la aplicación del Derecho penal y su desenvolvimiento en función de los ordenamientos procesales. Miran al juez como orientador. Cualquier expresión o gesto suyo que pueda considerarse como indicio de su pensamiento ha de tener necesariamente un gran impacto en la mente de cada jurado y en su proceso decisional. Se ha reconocido como un axioma el hecho de que el jurado es altamente sensible a toda manifestación judicial, debido a la autoridad que para el jurado conllevan las palabras del juez. *Moody* v. *United States*, 377 F.2d 175, 179 (1967). En *Bursten* v. *Unites States*, supra, se hizo referencia al impacto sobre el jurado de las manifestaciones del juez como materia de conocimiento judicial. Véanse, además, Conner, *The Trial Judge, His Facial Expressions, Gestures and General Demeanor—Their Effect on the Administration of Justice*, 6 *Am. Crim. L. Q.* 175 (1968); y nota, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 Va. L. Rev. 1266 (1975). ¿Puede sustraerse el jurado de sentir animosidad hacia el abogado que es reprendido por el juez por supuestas faltas a su respeto o conducta impropia? ¿Puede garantizarse que esa animosidad no se refleje en su veredicto?

Los hechos, los incidentes, y las circunstancias todas que revelan los autos dejan en mi ánimo serias dudas sobre si tuvo el apelante un juicio justo. De ordinario no intervendría con la apreciación de la prueba hecha por el jurado. En este caso, sin embargo, esa apreciación de la prueba pudo ser desviada por el incidente de desacato y ser perjudicial. Estas consideraciones me impiden aceptar el dictamen de mis compañeros jueces de que el segundo error no se cometió.

Revocaría las sentencias apeladas y ordenaría la celebración de un nuevo juicio.