Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>CARLOS ENRIQUE FONT MELÉNDEZ<br><br>Apelante | KLAN202300821 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Caso Núm.<br>D VI2021G0012<br>D VI2021G0013<br><br>Sobre:<br>Art. 93(D) 1er. Grado CP 2012 (2 cargos) |
| --- | --- | --- |

Panel integrado por su presidente el Juez Bermúdez Torres, la Jueza Romero García y la Jueza Rivera Pérez

**SENTENCIA**

En San Juan, Puerto Rico, a 17 de diciembre 2024.

I.

Por hechos acontecidos el 8 de marzo de 2020, el Ministerio Público presentó cinco (5) denuncias contra el señor Carlos Font Meléndez. Le imputó dos (2) infracciones al Art. 93 (a) del Código Penal,[1] además de violar el Art. 6.05 –*Portación, Transportación o Uso de Armas de Fuego sin Licencia*–[2] y el Art. 6.14 –*Disparar o Apuntar Armas de Fuego*–,[3] de la Ley de Armas de Puerto Rico.[4] Luego de que el Tribunal de Primera Instancia determinara causa probable para acusar, el 16 de marzo de 2021, el Ministerio Público presentó los correspondientes pliegos acusatorios contra Font Meléndez. Las acusaciones por los delitos de Asesinato en primer alegaron lo siguiente:

> CARLOS E FONT MELENDEZ, actuando en concierto y común acuerdo con el SR. ISRAEL MARTINEZ DIAZ C/P BURRUCO, allí entonces en fecha, hora y sitio arriba indicado que forma parte de la jurisdicción del Tribunal

---

[1] COD. PEN PR art. 93, 33 LPRA § 5142.
[2] Ley de Armas de Puerto Rico, Ley Núm. 168-2019, 25 LPRA §461.
[3] *Id.*, 25 LPRA §466d.
[4] *Id.*, 25 LPRA §466m.

Número Identificador

SEN2024_____

de Primera Instancia de Puerto Rico, Sala de Bayamón, ilegal, voluntaria, a sabiendas, maliciosa, a propósito y con intención criminal premeditadamente y mediante acecho, dio muerte al ser humano JIMMY ADORNO ORTIZ, CONSISTENTE en que utilizando un arma de fuego COLOR NEGRA, le hizo varios disparos al cuerpo ocasionándole la muerte.[5]

CARLOS E FONT MELENDEZ, actuando en concierto y común acuerdo con el SR. ISRAEL MARTINEZ DIAZ C/P BURRUCO, allí y entonces en fecha, hora y sitio arriba indicado que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Bayamón, ilegal, voluntaria, a sabiendas, maliciosa, a propósito y con la intención criminal premeditadamente y mediante acecho, dio muerte al ser humano DERECK GUZMÁN DÍAZ, CONSISTENTE en que utilizando un arma de fuego COLOR NEGRA, le hizo varios disparos al cuerpo ocasionándole la muerte.[6]

Celebrado el juicio los días 17 de agosto y 12 al 15 de diciembre de 2021, el Jurado rindió un veredicto de culpabilidad por los dos cargos del Art. 93(d) del Código Penal del 2012. Lo exoneró de los restantes tres cargos que imputaron violación a la Ley de Armas de Puerto Rico.[7] El 18 de agosto de 2023, el Tribunal de Primera Instancia dictó *Sentencia* y condenó a Font Meléndez a noventa y nueve (99) años de cárcel en cada caso, a ser cumplidos de forma concurrente entre sí.

En desacuerdo, el 18 de septiembre de 2023, Font Meléndez acudió ante nos mediante *Apelación.* Señala:

A. COMETIÓ ERROR DE DERECHO EL TRIBUNAL DE PRIMERA INSTANCIA AL DAR INSTRUCCIONES DE ACECHO AL JURADO CUANDO LAS DOS ACUSACIONES AUTORIZADAS ERAN SOBRE EL INCISO (D) DEL ART[Í]CULO 93 DEL CÓDIGO PENAL DE PUERTO RICO DEL 2012, SEG[Ú]N ENMENDADO.

B. COMETIÓ ERROR DE DERECHO EL TRIBUNAL DE PRIMERA INSTANCIA AL NO DAR INSTRUCCIONES DE LOS ELEMENTOS DEL INCISO (D) DEL ART[Í]CULO 93 AL JURADO CUANDO LAS DOS ACUSACIONES AUTORIZADAS ERAN SOBRE EL INCISO (D) DEL ART[Í]CULO 93 DEL CÓDIGO PENAL DE PUERTO RICO DEL 2012, SEGÚN ENMENDADO.

---

[5] Apéndice del recurso, págs. 14-15.

[6] *Id.*, págs. 16-17.

[7] 25 LPRA § 461.

C. ERRÓ EL JURADO EN LA APRECIACIÓN DE LA PRUEBA ORAL Y DOCUMENTAL, AL DETERMINAR QUE EL ESTADO PROBÓ MÁS ALLÁ DE DUDA RAZONABLE LA CULPABILIDAD DEL APELANTE POR EL DELITO DE[L] ARTÍCULO 93 INCISO (D) DEL C.P. 2012, DOS CARGOS, SEGÚN IMPUTADOS CUANDO EN LAS ACUSACIONES NO SE ALEGÓ LOS ELEMENTOS DEL INCISO (D) A PROPÓSITO O CON CONOCIMIENTO, A CONSECUENCIA DE DISPARAR UN ARMA DE FUEGO EN UN LUGAR PÚBLICO O ABIERTO AL P[Ú]BLICO O DESDE UN VEHÍCULO DE MOTOR.

D. ERRÓ EL JURADO EL EMITIR VEREDICTO DE CULPABILIDAD, A PESAR DE QUE EL ESTADO NO PUDO ESTABLECER, MÁS ALLÁ DE DUDA RAZONABLE, LOS ELEMENTOS CORRESPONDIENTES AL DELITO DE ASESINATO EN PRIMER GRADO, ESPECIALMENTE ANTE LA AUSENCIA DE PRUEBA SOBRE LOS ESTADOS MENTALES "A PROPÓSITO" Y "CON CONOCIMIENTO" NO EMPECE ESTOS NO HABER SIDO ALEGADOS EN LAS ACUSACIONES.

E. ERRÓ EL JURADO AL EMITIR VEREDICTO DE CULPABILIDAD, A PESAR DE QUE, EN LA ALTERNATIVA, SE CUMPLIERON CON TODOS LOS REQUISITOS LEGALES PARA ATENUAR LA RESPONSABILIDAD CRIMINAL DEL APELANTE AL CONFIGURARSE TODOS LOS ELEMENTOS DEL DELITO DE ASESINATO ATENUADO.

F. ERRÓ EL JURADO AL DECLARAR CULPABLE AL APELANTE EN DOS CARGOS DE ASESINATO EN PRIMER GRADO AL AMPARO DEL INCISO (D) DEL ARTÍCULO 93 DEL C.P. 2012, A PESAR DE QUE LAS ACUSACIONES CRIMINALES INSTADAS POR EL MINISTERIO PÚBLICO ERAN INSUFICIENTES EN DERECHO PARA QUE RECAIGA UNA CONVICCIÓN V[Á]LIDA, YA QUE EN EL CUERPO DE LOS PLIEGOS ACUSATORIOS NO SE ALEGARON TODOS LOS ELEMENTOS DEL DELITO DE NINGUNA DE LAS MODALIDADES DE ASESINATO CONTENIDAS EN EL MENCIONADO INCISO.

G. ERRÓ EL JURADO AL DECLARAR CULPABLE AL APELANTE EN DOS CARGOS DE ASESINATO EN PRIMER GRADO AL AMPARO DE INCISO (D) DEL ART[Í]CULO 93 DEL C.P. 2012, A PESAR DE QUE EL VEREDICTO ABSOLUTORIO POR LOS CARGOS RELACIONADOS CON LA LEY DE ARMAS IMPED[Í]A COMO CUESTIÓN DE DERECHO LA CONVICCIÓN POR EL DELITO DE ASESINATO EN PRIMER GRADO AL AMPARO DEL MENCIONADO INCISO.

El 17 de junio de 2024 Font Meléndez presentó su *Alegato de Apelación*. El 18 de junio de 2024 le concedimos a la Oficina del Procurador General, plazo de treinta (30) días para que

compareciera con su *Alegato* de réplica. Así lo hizo el 24 de septiembre de 2024.

Con el beneficio de la comparecencia de las partes, la Transcripción Estipulada de la Prueba Oral (TEPO), y luego de hacer un ponderado análisis de los autos originales y la prueba vertida en el juicio, a tenor con el Derecho y jurisprudencia aplicable, procedemos a resolver.

## II.

Iniciamos la discusión de los errores, con el señalamiento F, atinente a la suficiencia de las acusaciones. Font Meléndez indica que las acusaciones imputándole dos cargos de Asesinato en primer grado en la modalidad del inciso (d) del Art. 93 del Código Penal de 2012 fueron insuficientes debido a que en el cuerpo de los pliegos no se alegaron todos los elementos del delito, según se consignó en el título de la acusación.

En estrecha vinculación con este error, en su señalamiento de error C, Font Meléndez sostiene que el Jurado se equivocó al encontrarlo culpable de los dos cargos de Asesinato imputados, "cuando en las acusaciones no se alegó los elementos del inciso (d) a propósito o con conocimiento, a consecuencia de disparar un arma de fuego en un lugar público o abierto al p[ú]blico o desde un vehículo de motor". Veamos.

## A.

El derecho constitucional de un acusado a una debida notificación de los cargos presentados en su contra[8] se cumple con el pliego acusatorio y la entrega de copia de este al acusado.[9] Según

---

[8] La Sexta Enmienda de la Constitución de Estados Unidos dispone, en lo pertinente, lo siguiente: "In all criminal prosecutions, the accused shall enjoy the right. . .to be informed of the nature and cause of the accusation". Mientras que el Artículo II, Sección 11 de nuestra Constitución establece que, "el acusado disfrutará del derecho. . .a ser notificado de la naturaleza y causa de la acusación". CONST. PR art. II, Sec. 11, LPRA, Tomo 1.
[9] *Pueblo* v. *Vélez Rodríguez,* 186 DPR 621, 627 (2012).

la Regla 35 de Procedimiento Criminal,[10] toda acusación ha de contener:

> (c) Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuales se interpretarán en su significado legal. Dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieren el mismo significado. En ningún caso será necesario el expresar en la acusación o denuncia presunciones legales ni materias de conocimiento judicial.
> . . . .

Al interpretar este articulado, el Tribunal Supremo ha indicado que, "[c]uando un delito puede cometerse en dos (2) o más formas o modalidades diferentes, según tipificadas en la misma disposición penal, puede incluirse en un solo cargo de la acusación todas las modalidades que alegadamente cometieron los imputados si éstos fueron cometidos con un mismo propósito, fin o designio criminal en un mismo curso de conducta por constituir todos los actos realizados un solo delito".[11] De manera que, el pliego puede imputar más de una modalidad sin que ello lo invalide.

En lo aquí pertinente, la mencionada Regla 35 de Procedimiento Criminal, en su inciso (d) aclara que, si bien el pliego acusatorio debe incluir la cita de la ley o disposición que se alegue ha sido infringida, "la omisión de tal cita o una cita errónea se considerará como un defecto de forma". En tal sentido, la Regla 36 de Procedimiento Criminal, establece que "una acusación o denuncia no será insuficiente, ni podrán ser afectados el juicio, la sentencia o cualquier otro procedimiento basado en dicha acusación

---

[10] 34 LPRA AP. II R. 35.
[11] *Pueblo* v. 186 DPR, págs. 856-857.

o denuncia, por causa de algún defecto, imperfección u omisión de forma que no perjudicare los derechos sustanciales del acusado".[12]

En cuanto a los defectos de forma, la Regla 38 (a) del mismo cuerpo de normas procesales, dispone que, "[s]i la acusación, la denuncia o un escrito de especificaciones adolecieren de algún defecto, imperfección u omisión de forma aludido en la Regla 36, el tribunal podrá permitir en cualquier momento las enmiendas necesarias para subsanarlo. En ausencia de enmienda, dicho defecto, imperfección u omisión se entenderá subsanado una vez rendido el veredicto del jurado o el fallo del tribunal".[13] Así que, los defectos de forma, lejos de tornar insuficiente al pliego acusatorio, puede enmendarse en cualquier momento y, de no solicitarse la enmienda, el pliego se entiende subsanado una vez se rinde el veredicto o fallo del tribunal.[14]

Según ha manifestado el Tribunal Supremo, "lo determinante es el contenido de los hechos que se imputan y no el título. En casos de conflictos entre los hechos probados y la calificación del delito que es en sí una conclusión, los hechos deben predominar".[15] "Sólo se le exige que el contenido, no el epígrafe, de la acusación o denuncia exponga todos los hechos constitutivos del tipo delictivo".[16]

B.

Como reseñamos previamente, los pliegos acusatorios imputándole a Font Meléndez dos cargos de Asesinato en primer grado, clasificaron el delito como la modalidad del inciso (d) del Art. 93 del Código Penal. Esta modalidad tipifica como Asesinato en

---

[12] 34 LPRA AP. II R. 36.
[13] 34 LPRA AP. II R. 38.
[14] *Pueblo* v. *Pérez Feliciano*, 183 DPR 1003, 1012 (2011).
[15] *Pueblo* v. *Candelario Couvertier*, 100 DPR 159 (1971); Véase además *Pueblo* v. *Rodríguez, Cartucho*, 46 DPR 542, 544, 546-547 (1934); *Pueblo* v. *Seda*, 82 DPR 719 (1961).
[16] *Pueblo* v. *Montero Luciano*, 169 DPR 360, 373 (2006); Véase además *Vizcarra Castellón* v. *El Pueblo*, 92 DPR 156 (1965); *Pueblo* v. *Bermúdez*, 75 DPR 760 (1954); *Pueblo* v. *Conroig Vázquez*, 60 DPR 168, 169 (1942); *Pueblo* v. *Canals*, 48 DPR 794, 802 (1935).

primer grado la conducta de causar la muerte "al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado". No obstante, ambos pliegos, diferenciados únicamente por quien resultó ser la víctima, alegaron que, Font Meléndez, en concierto y común acuerdo con otro sujeto, a propósito, y con intención criminal, dio muerte a un ser humano disparándole varias veces con un arma de fuego.

Ciertamente, el cuerpo de los pliegos acusatorios no imputa la modalidad anunciada en el encasillado donde se consigna la disposición de ley infligida. Sin embargo, ambas acusaciones imputaron cabalmente los elementos del tipo de Asesinato en primer grado en su modalidad clásica del inciso (a) del Art. 93, esto es, el asesinato perpetrado a propósito o con conocimiento. Ello así, no estamos ante una violación constitucional por inadecuada notificación de los cargos que se le imputaron.

Lo anterior hace igualmente inmeritorio el argumento esgrimido en el señalamiento de error F, de que, no procedía encontrarlo culpable debido a que, "en las acusaciones no se alegó los elementos del inciso (d) a propósito o con conocimiento, a consecuencia de disparar un arma de fuego en un lugar público o abierto al público o desde un vehículo de motor". Como habremos de ampliar más adelante, habiéndose imputado satisfactoriamente la modalidad clásica de Asesinato en primer grado, lo único que el Ministerio Público debía probar en el juicio era que, Font Meléndez, a propósito o con conocimiento, causó la muerte a un ser humano.

III.

En su señalamiento D, Font Meléndez plantea que, el Jurado se equivocó al "emitir veredicto de culpabilidad, a pesar de que el Estado no pudo establecer, más allá de duda razonable, los elementos correspondientes al delito de asesinato en primer grado,

especialmente ante la ausencia de prueba sobre los estados mentales a propósito y con conocimiento". No tiene razón. Veamos por qué.

A.

El Art. 92 del Código Penal,[17] tipifica el delito de asesinato de forma general o básica, como dar muerte a un ser humano a propósito, con conocimiento o temerariamente. Por su definición y naturaleza, dar muerte a un ser humano constituye "un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad. Denota un estado o una condición en el actor, compuesto por una deficiencia inherente en su sentido de moral y rectitud, ello como resultado de haber dejado de preocuparse por el respeto y la seguridad de la vida humana".[18]

El elemento objetivo o parte externa de la conducta lo constituye al dar muerte a un ser humano. La parte interna o subjetiva del tipo se configura a título de intención, esto es, los estados mentales de **a propósito**, **con conocimiento** o **temerariamente**.[19] En tal sentido, el Art. 21 del vigente Código Penal[20] dispone que:

> (a) Una persona solamente puede ser sancionada penalmente si actuó a propósito, con conocimiento, temerariamente o negligentemente con relación a un resultado o circunstancia prohibida por ley.
>
> (b) El elemento subjetivo del delito se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona.

De otra parte, el Art. 22 del mismo Código,[21] expone cuales son los distintos elementos subjetivos del delito. Estos son:

> (1) A propósito
>      (a)   con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado.

---

[17] 33 LPRA § 5141.
[18] *Rivera Pagán* v. *Supte. Policía de P.R.,* 135 DPR 789, 800 (1994).
[19] DORA NEVARES-MUÑIZ, CÓDIGO PENAL DE PUERTO RICO, COMENTADO POR DORA NEVARES MUÑIZ 149 (2019).
[20] 33 LPRA § 5034.
[21] *Id* § 5035.

(b) con relación a una circunstancia, una persona actúa "a propósito" cuando la persona cree que la circunstancia existe.

(2) Con conocimiento
(a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.
(b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura.

(3) Temerariamente
Una persona actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado o la circunstancia prohibida por ley.
. . . .

Estos estados mentales pueden deducirse de "los actos y las circunstancias que rodearon la muerte; la relación entre las partes; la capacidad mental, motivación, manifestaciones y conducta del acusado, así como de los hechos anteriores, concomitantes y posteriores al crimen".[22]

El ordenamiento penal agrupa en la definición de asesinato todas aquellas modalidades en las que exista la intención de matar.[23] A modo de ejemplo, "[e]l uso de un arma puede implicar razonablemente una intención. . .equivalente a propósito, conocimiento o temeridad de matar o de causar daños cuya consecuencia probable sea la muerte".[24] A pesar de que el delito de asesinato es un solo delito, el Art 93[25] clasifica en grados el delito de Asesinato y enumera una serie de modalidades. Dispone:

Constituye asesinato en primer grado:

(a) **Todo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento.**

(b) Todo asesinato causado al perpetrarse o intentarse algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago (excluyendo la modalidad negligente), envenenamiento de aguas de uso

---

[22] *Pueblo* v. *Negrón Ayala*, 171 DPR 406 (2007).
[23] *Id.*; *Pueblo* v. *Roche*, 195 DPR 791, 797 (2016).
[24] Nevares-Muñiz, op. cit., pág. 151.
[25] 33 LPRA § 5142.

público (excluyendo la modalidad negligente), agresión grave, fuga, maltrato (excluyendo la modalidad negligente), abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la "Ley para la Protección e Intervención de la Violencia Doméstica".

(c) Toda muerte de un funcionario del orden público o guardia de seguridad privado, fiscal, procurador de menores, procurador de asuntos de familia, juez u oficial de custodia que se encuentre en el cumplimiento de su deber.

(d) Todo asesinato causado al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado.

(e) Todo asesinato en el cual la víctima es una mujer y al cometerse el delito concurre alguna de las siguientes circunstancias:

(1) Que haya intentado establecer o restablecer una relación de pareja o de intimidad con la víctima; o

(2) Que mantenga o haya mantenido con la víctima relaciones familiares, conyugales, de convivencia, de intimidad o noviazgo; o

(3) Que sea el resultado de la reiterada violencia en contra de la víctima.

Toda otra muerte de un ser humano causada temerariamente constituye asesinato en segundo grado.

La primera modalidad del Asesinato en primer grado o la clásica, se comete **a propósito** o **con conocimiento**. "Mata a propósito quien tiene el objetivo consciente de causar la muerte de la víctima; mientras que mata con el estado mental de conocimiento quien sabe que la muerte es una consecuencia prácticamente segura de su conducta".[26] El delito de Asesinato en segundo grado tipificado en el último párrafo de la citada disposición estatutaria se considera cometido al dar muerte a un ser humano de forma temeraria.[27] Ni en el Asesinato en primer grado ni en el segundo grado media una perturbación mental o emocional por un arrebato

---

[26] DORA NEVARES-MUÑIZ, CÓDIGO PENAL DE PUERTO RICO, COMENTADO POR DORA NEVARES MUÑIZ 155 (2019).
[27] *Id.*

de cólera o de súbita pendencia. En caso de que así ocurra, estaríamos ante asesinato atenuado.[28]

B.

Nuestra Carta Magna dispone que, la culpabilidad de todo acusado de delito sólo se establece probando más allá de toda duda razonable todos los elementos del delito y su conexión con el acusado.[29] Orientada por este precepto constitucional, la Regla 110 de Procedimiento Criminal, afirma que, "[e]n todo proceso criminal, se presumirá inocente el acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se absolverá".[30] De igual forma, la Regla 110 de las de Evidencia, rectora de los principios sobre cómo evaluar la suficiencia de la prueba, indica, que "[e]n los casos criminales, la culpabilidad de la persona acusada debe ser establecida más allá de duda razonable".[31]

Este concepto de duda razonable es algo más que preponderancia de la evidencia, que en términos de probabilidades equivaldría a no menos de un 80 a 90 por ciento. Tampoco es duda imaginaria, especulativa o posible, y mucho menos, la duda cartesiana o la de un escéptico. Se trata de aquella insatisfacción o intranquilidad del juzgador sobre la culpabilidad del acusado luego de desfilada la prueba.[32] Más que certeza matemática, solo se exige probar el caso con razonable certeza, a través de prueba suficiente y satisfactoria en derecho.[33] La duda que justifica la absolución, no solo debe ser razonable, sino que debe surgir de una serena, justa e

---

[28] *Id.*
[29] *Pueblo* v. *Concepción Guerra*, 194 DPR 291 (2015); *Pueblo* v. *Irizarry*, 156 DPR 780, 786-787 (2002); *Pueblo* v. *Bigio Pastrana*, 116 DPR 748, 760-761 (1985).
[30] Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R.110; Regla 304 de las de Evidencia, 32 LPRA Ap. VI, R.304; *Pueblo* v. *Casillas, Torres*, 190 DPR 398, 413-414 (2014); *Pueblo* v. *De Jesús Mercado*, 188 DPR 467, 475 (2013).
[31] 32 LPRA Ap VI, R. 110.
[32] *Pueblo* v. 156 DPR, pág. 788.
[33] *Pueblo* v. *Feliciano Rodríguez*, 150 DPR 443, 447 (2000).

imparcial consideración de toda la evidencia del caso o de la falta de suficiente prueba en apoyo a la acusación.[34]

Por ello, el juzgador de los hechos tiene que hacer un ejercicio valorativo de la totalidad de la prueba, con el más alto sentido común, lógica y experiencia. Con ello se logra deducir cuál de las versiones, si alguna, prevalece sobre las otras.[35] "La suficiencia de la prueba es, pues, un análisis estrictamente en derecho que, aunque recae sobre la evidencia, solo busca asegurar que, de cualquier manera, en que se interprete la veracidad, los requisitos legales estarán presentes para poder permitir cualquiera de los veredictos posibles".[36]

La doctrina establece que la evaluación imparcial que de la prueba haya hecho el juzgador de los hechos, merece nuestro mayor respeto y confiabilidad.[37] Como foro revisor no intervendremos con ella, a menos que se demuestre error manifiesto, pasión, prejuicio o parcialidad. Distinto a nuestra función revisora, en sus funciones adjudicativas el juzgador de hechos está en mejor posición de evaluar la prueba al escuchar y observar los testigos que ante él declaren.[38] Ante la existencia de conflictos en la prueba, corresponde a dicho Foro dirimirlos, particularmente cuando están en cuestión elementos altamente subjetivos.[39] También corresponde al juzgador de los hechos resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables o incluso, creíbles.[40]

Por ello, recae sobre el que sostiene lo contrario el peso de probar la irregularidad alegada y que la misma afectó

---

[34] *Pueblo* v. *Collado Justiniano*, 140 DPR 107, 116 (1996).
[35] *Pueblo* v. *Colón, Castillo*, 140 DPR 564, 578 (1996).
[36] *Pueblo* v. 190 DPR, pág. 415.
[37] *Pueblo* v. *Santiago et al.*, 176 DPR 133, 147-148 (2009).
[38] *Pueblo* v. *Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991).
[39] *Id.,* pág. 493.
[40] *Pueblo* v. *Chévere Heredia*, 139 DPR 1, (1995); *Pueblo* v. *Rivera Carmona*, 108 DPR 866, 872 (1979).

sustancialmente el resultado obtenido.[41] Ciertamente, la aplicación de este estándar se revisa como cuestión de derecho y en apelación, igual los jueces apelativos tenemos derecho a tener la conciencia tranquila en cuanto a si se probó la culpabilidad del acusado más allá de duda razonable.[42]

La norma rectora, al revisar cuestiones relativas a condenas criminales, es que la apreciación de la prueba corresponde en primera instancia al foro sentenciador porque es quien está en mejor posición, por haber escuchado a los testigos y observado su comportamiento.[43]

En fin, al revisar un fallo o veredicto de culpabilidad, evaluamos si el récord, razonablemente apoya la determinación de culpabilidad, bajo el discutido *quantum* de prueba más allá de duda razonable. No, si la evidencia establece la culpabilidad más allá de duda razonable, sino, si luego de examinar la totalidad de la evidencia de maneras más favorable para el acusado, cualquier juzgador de hechos racional hubiera encontrado probado más allá de duda razonable los elementos esenciales del delito.

Solo en casos en que el tribunal de instancia incurra en pasión, prejuicio, error manifiesto, a pesar de que el juzgador haya observado al testigo, no le concederemos la deferencia que como regla general se le confiere. Es decir, solo intervendremos con las conclusiones de hechos de un foro primario cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de esta.[44]

---

[41] *Pueblo* v. *Echevarría Rodríguez I,* 128 DPR 299, 328 (1991).
[42] *Pueblo* v. *González Román,* 138 DPR 691, 989 (1995); *Pueblo* v. *Cabán Torres,* 117 DPR 645, 655 (1986); *Pueblo* v. *Carrasquillo Carrasquillo,* 102 DPR 545, 552 (1974).
[43] *Pueblo* v. *De Jesús Mercado,* 188 DPR 467, 478-479 (2013).
[44] *Miranda Cruz y otros* v. *S.L.G. Ritch,* 176 DPR 951, 974 (2009).

C.

Con esta normativa como marco de referencia, evaluemos si la prueba ofrecida en el juicio fue suficiente para que el Jurado pudiera, razonablemente, emitir un veredicto de culpabilidad contra Font Meléndez por los dos cargos de Asesinato en primer grado, en calidad de coautor.

El Agente José A. Vélez Vargas declaró que el 8 de marzo de 2020, en horas de la madrugada, recibió una comunicación por radio del Sistema 911 informándole sobre unas detonaciones en Lomas del Sol, Guaynabo, alrededor de las dos y cuarto de la mañana.[45] Atestó que fue inmediatamente al lugar, que era un área rural de mucha incidencia criminal.[46] Narró que al llegar a la escena, encontró un vehículo Honda Oddyssey encendido, incluyendo sus luces, y que en el asiento del conductor se encontraba el cuerpo baleado de un joven.[47] Añadió que, en la parte posterior, vio el cuerpo baleado del otro joven.[48]

Afirmó que mientras custodiaba la escena, se acercó un joven, que se identificó como Christian López Rivera y le informó que había llegado con los occisos al lugar.[49] Aseveró que le tomó la información del joven y le pidió que se quedara en el área.[50] Según declaró, le brindó los datos de López Rivera al Agente Lafontaine González de la División de Homicidios, al este llegar a la escena. Con relación a las fotos admitidas, reconoció el vehículo donde encontró a los occisos, las residencias aledañas con cámara de seguridad, así como la residencia donde reside López Rivera con sus padres, propiedad que se encontraba localizada justo al frente de la escena.[51]

---

[45] Transcripción estipulada de la prueba oral del juicio en su fondo (TEPO), pág. 19, líneas 15-20.
[46] TEPO, pág. 20, líneas 2-5.
[47] *Id.*, pág. 22, líneas 9-20 y pág. 23, líneas 1-5.
[48] *Id.*, pág. 23.
[49] *Id.*, pág. 25, líneas 9-20.
[50] *Id.*
[51] *Id.*, pág. 27.

La segunda testigo fue la Sra. Miveliz Ortiz Quiñones, madre del occiso Jimmy Adorno Ortiz. Según su testimonio, el 8 de marzo de 2020, se encontraba en el hospital cuando su hija se comunicó con ella y le informó sobre unos asesinatos ocurridos en Guaynabo, y que uno de los muertos era su hijo Jimmy.[52] Acudió al Instituto de Ciencias Forenses (ICF) e identificó el cadáver de su hijo.[53] La última vez que vio a su hijo con vida fue el sábado en la madrugada.[54] Recordó que el día siguiente su esposo le dijo que Jimmy fue a la playa, información que corroboró a través de la comunicación que tuvo con él por mensaje de texto ese día.[55]

Añadió que esa noche le escribió a Jimmy que era tarde, que ya era hora que llegara y que le respondió que estaba esperando que Font Meléndez se fuera.[56] Ella sabía quién era Font Meléndez, a quien identificó en sala como el acusado y expuso que su hijo Jimmy le había hablado sobre él, ya que eran amigos.[57] En una ocasión, este último visitó su casa.[58] En respuesta a las preguntas de la Defensa, declaró que el día de los hechos Font Meléndez fue a su casa a darle el pésame, pero que no llegó hasta donde ella.[59]

Ese mismo día testificó la Sra. Sullyan Díaz Oquendo. Declaró que era la mamá del occiso Dereck Guzmán y que tenía una buena relación con su hijo.[60] El 8 de marzo de 2020 recibió una llamada de madrugada para que pasara al ICF y fue en ese entonces que se le informó que había ocurrido un asesinato y que su hijo podría ser uno de los perjudicados.[61]

El sábado 7 de marzo de 2020, fue el último día que vio a su hijo con vida y este le dijo que iba a salir a la playa con unas

---

[52] *Id.*, pág. 45, línea 16 y pág. 46, líneas 4-6.
[53] TEPO, pág. 46, líneas 8-20.
[54] *Id.*, pág. 47.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*, pág. 49, líneas 4-8.
[60] *Id.*
[61] *Id*, pág. 52, líneas 10-20.

amistades.[62] Sobre Font Meléndez testificó que no lo conocía, pero sí conocía a Israel Martínez "Burruco" porque estudiaba en la misma escuela que su hijo Dereck.[63] Indicó que Dereck estaba estudiando el último módulo de cuarto año y que murió a sus 17 años de edad.[64]

El Agente Obed Dilan Rodríguez, investigador forense en el ICF de Puerto Rico,[65] atestiguó que llegó a la escena del crimen a las 4:55am y allí recopiló la evidencia.[66] Preparó dos informes con relación a los hallazgos de escena, uno por cada persona fallecida.[67] Narró cómo el primer occiso fue localizado en el lado del conductor y el segundo occiso estaba ubicado en el asiento trasero del lado derecho del vehículo.[68] Explicó que levantó muestras de material biológico de las manijas del vehículo para comparación de ADN.[69] Declaró que no se localizó un arma de fuego en la escena, pero que se levantaron catorce casquillos de bala calibre 9mm, un blindaje y dos fragmentos plomos.[70] Ocupó un abastecedor con veinticuatro balas, Glock 9mm sin disparar, en el bolsillo del occiso localizado en el asiento trasero.[71] También, indicó que se encontró una envoltura marrón a manera de cigarrillo con picadura de aparente marihuana.[72]

El testigo manifestó que, al examinar el vehículo Honda Odyssey gris, tablilla HLL-2021 de 2009, estaba encendido, tenía los focos encendidos y el radio estaba apagado.[73] Expuso que el informe contenía la descripción de los occisos que estaban en el vehículo, su posición y su vestimenta al momento de los hechos.[74] Sostuvo que,

---

[62] TEPO, pág. 53.
[63] *Id.*, pág. 53, líneas 11-20.
[64] *Id.*, pág. 54, líneas 1-9
[65] *Id*, pág. 78, líneas 4-6.
[66] *Id.*, pág. 82
[67] *Id.*, pág. 83.
[68] *Id.*
[69] *Id.*
[70] *Id.,* págs. 88-89.
[71] *Id.,* págs. 88-89.
[72] *Id.*
[73] *Id.,* pág. 90.
[74] *Id.,* págs. 91-94.

el examen preliminar de los cuerpos reflejaba signos de violencia en el occiso ubicado en asiento delantero, ya que este tenía varias heridas de proyectil, en la nariz, cuello y oreja.[75] Por su parte, el occiso ubicado en parte trasera presentaba heridas de bala en el pecho, brazo y antebrazo izquierdo.[76] Según el informe preliminar, a los occisos les habían infligido aproximadamente veintidós heridas de bala.[77] Afirmó que la evidencia recolectada fue entregada al ICF para los análisis correspondientes.[78]

Describió las fotografías que fueron tomadas en la escena, las mismas formaban parte del informe, y habían sido admitidas como *exhibits* por estipulación. Entre las fotografías tomadas se encontraban las fotos de la residencia localizada justo al frente del vehículo dónde yacían los cuerpos de los occisos y el letrero que advertía que era una propiedad aledaña tenía cámaras grabando.[79]

De otra parte, el Agente Isander Rivera Ortiz, adscrito a la División de Homicidio, diligenció, junto al Agente La Fontaine González, las órdenes de allanamiento de la residencia de Font Meléndez, a quién identificó en corte abierta.[80] Afirmó que pasó a la residencia donde había una menor que indicó que su madre no estaba, pero la contactaría.[81] Expresó que la dama llegó quince minutos más tarde, y que este le explicó el propósito de su visita y le entregó copia de la Orden.[82] Otros agentes y el personal de servicios técnicos se encargaron de documentar el proceso.[83]

Sostuvo que registró el interior de la residencia y que, en el cuarto que la dama identificó que pertenecía a Font Meléndez, encontró un teléfono celular, un bulto lleno de ropa, una libreta con

---

[75] *Id.*
[76] *Id.,* págs. 95-96.
[77] *Id.*
[78] *Id.*
[79] *Id.,* págs. 97-102.
[80] TEPO, págs. 107-108.
[81] *Id.*, pág. 109.
[82] *Id.*
[83] *Id.,* pág. 110.

una documentación y una carta.[84] Ocupó y documentó esa evidencia y se la entregó al Agente Lafontaine González.[85] Indicó también, que diligenció una Orden para ocupar el vehículo Honda perteneciente Font Meléndez, estacionado frente a la residencia e identificado por la madre como el vehículo de este último.[86] Expuso que nunca encontró las llaves, así que se lo llevaron en grúa.[87] El testigo documentó el proceso de ocupación del vehículo y, posteriormente, fue enviado a ICF para análisis.[88] Detalló las fotografías tomadas a la residencia durante el allanamiento, fotos que fueron admitidas como *Exhibit* por estipulación.[89]

Por su parte, el 13 de octubre de 2021, el Sr. Christian López Rivera se sentó a declarar como sexto testigo. Este residía en Lomas del Sol en Guaynabo y conocía del barrio a Font Meléndez desde hace mucho tiempo.[90] Lo identificó en corte abierta.[91] Explicó que conocía al coacusado, Martínez Díaz o "Burruco", porque coincidieron en séptimo grado en la escuela, aunque compartía poco con él.[92] Aseveró que conoció a Jimmy a principios de enero de 2020, a través de Font Meléndez.[93] Sobre Dereck, testificó que lo conoció el día de los hechos.[94]

Narró que el 7 de marzo de 2020, acordó con Jimmy ir a la playa Hobbie en Isla Verde y este lo buscó en una guagua Honda Odyssey, color gris.[95] Al montarse en el carro se percató que habían dos personas que no conocía, Dereck y otro individuo conocido por Mante.[96] Expresó que se detuvieron en un puesto de gasolina PUMA

---

[84] *Id.* y pág. 111, líneas 1-20.
[85] *Id.*
[86] *Id.*
[87] *Id.,* pág. 112, líneas 6-12.
[88] TEPO, pág. 112.
[89] *Id.,* págs. 113-115.
[90] *Id.*, pág. 129, líneas 11-20 y pág. 130, líneas 1-6.
[91] *Id.*, y pág. 131, líneas 1-11.
[92] *Id.*, pág. 130, líneas 7-15.
[93] *Id.*, pág. 134, líneas 14-20.
[94] *Id.*, pág. 135.
[95] *Id.*
[96] *Id.*

y luego fueron a la playa Hobbie en Isla Verde.[97] Al llegar, se estacionaron en el centro comercial donde estaba Pizza Hut.[98] Agregó que llegaron a la playa aproximadamente a la 1:00 pm y que compartieron con más personas y luego fumaron marihuana.[99]

Declaró que mientras estaba en la playa, **Font Meléndez lo llamó y le preguntó con quién estaba y él, le dijo**.[100] **Aseveró que Font Meléndez le preguntó si sabía que a Dereck lo estaban buscando para matarlo**.[101] También, le dijo que lo va a buscar por la tarde.[102] Añadió que mientras estuvieron en la playa, Jimmy le vendió marihuana a unos americanos.[103] Sobre esto, indicó que, además de trabajar en "algo de tarimas y carpas", Jimmy vendía marihuana.[104] Atestiguó que las personas que estaban en la playa planificaron ir en la noche al Viejo San Juan.[105] Al salir de la playa, Jimmy, Dereck, Mante y él dejaron a las muchachas en Guaynabo como a las 7:30 pm.[106] Contó que **escuchó cuando Font Meléndez llamó a Jimmy y este le dijo que estaba con él e inmediatamente después Font Meléndez lo llamó para cuestionarle por qué estaba con Dereck**.[107]

Indicó que, luego se fue junto con Dereck, Barbero y Mante al Viejo San Juan. **Al llegar al Viejo San y mientras se estacionaban en el Totem (Ballajá)[108] observó que Font Meléndez entró en un Honda negro "tinteado", y se estacionó en el estacionamiento frente a ellos**.[109] Reconoció su vehículo porque lo había visto antes.[110] **Font Meléndez y "Burruco" se bajaron juntos del**

---

[97] *Id.*
[98] TEPO, pág. 136.
[99] *Id.*, pág. 136.
[100] *Id.*, pág. 137, líneas 7-20.
[101] *Id.*
[102] *Id.*, pág. 138, líneas 13-19.
[103] *Id.*, pág. 139, líneas 11-20.
[104] *Id.*
[105] *Id.*
[106] *Id.*, pág. 140, líneas 6-10.
[107] *Id.*, líneas16-20 y pág. 141, líneas 1-3.
[108] *Id.*, pág. 44, líneas 12-14.
[109] TEPO, pág. 44, líneas 16-18.
[110] *Id.*, pág. 145, líneas 1-15.

**vehículo,**[111]  **momento en que escuchó que Dereck preguntó que "quién había llamado a esos cabrones" y dijo que "los problemas estaban a chorro".**[112] Añadió que mientras estuvieron en el Viejo San Juan bebieron y fumaron marihuana.[113]

Explicó que, más tarde esa noche, mientras estaba en una de las placitas en San Juan, **Font Meléndez lo llamó y le preguntó que para dónde iban luego y le respondió que para el 24 Market en Hato Rey**.[114] Particularizó que Dereck tenía una pistola en la mariconera.[115] Señaló que pasaron por el 24 Market, pero estaba lleno y decidieron ir a Guaynabo para llevar a Mante y a Barbero.[116] Sostuvo que al salir, echaron gasolina en una Gulf y luego fueron a la panadería La Francaise, donde este bajó y compró un sándwich y polvorones.[117] Mientras estaba allí, recibió **una llamada de Font Meléndez que le preguntó dónde estaba y este le contestó**.[118] Mientras estuvo en la panadería, **recibió dos llamadas de Font Meléndez.**[119] **En ese momento Font Meléndez le dijo que iba para el barrio donde este vivía.**[120] **Sin embargo, mientras estaba pagando en la panadería, Font Meléndez lo llamó nuevamente para preguntarle si estaba seguro de que iba para el barrio, a lo que respondió que sí.**[121] **Sobre esto, Font Meléndez le dijo que lo esperaran allí para ir a fumar con ellos**.[122]

Contó que, al llegar al barrio se estacionaron frente a la calle vecinal y este se bajó con su silla de playa.[123] Al bajarse, observó a "Burruco" acercarse con la mano en la cintura.[124] En ese momento,

---

[111] *Id.*, pág. 145.
[112] *Id.*, pág. 146, líneas 2-6.
[113] *Id.,* pág. 147, líneas 1-12.
[114] *Id.,* líneas 16-20.
[115] *Id.*, pág. 147, líneas 1-10.
[116] *Id.*
[117] *Id.*, pág. 149, líneas 1-20.
[118] *Id.*
[119] *Id.*, pág. 150, líneas 1-6.
[120] TEPO, pág. 150, líneas 11-20.
[121] *Id.*, pág. 150.
[122] *Id.*
[123] *Id.*
[124] *Id.*, pág. 151, líneas 1-20.

mencionó que se alejó y "Burruco" procedió a sacar un arma negra y disparó hacia Jimmy y Dereck.[125] Atestiguó que, tras escuchar unos cuantos tiros corrió y se escondió inmediatamente hacia la parte posterior de la casa del tío Nene.[126] Narró como luego de eso, "Burruco" se fue del lugar.[127] **Acto seguido observó como el Honda negro tinteado de Font Meléndez pasó y vio como "Burruco" se montó en el vehículo y se fue del lugar**.[128] Aseveró que no sabía para donde ellos fueron, ni supo más de ellos.[129] **No obstante, inmediatamente después que abandonó el lugar, Font Meléndez lo llamó y le preguntó si estaban muertos, a lo que le respondió que no sabía.[130] Luego se comunicaron nuevamente y en esa instancia él le cuestionó a Font Meléndez el por qué habían hecho eso**.[131] Le dijo que habían calentado el barrio, que lo habían calentado a él, que sus acciones estuvieron demás.[132] También le reclamó sus acciones estableciendo que lo que habían hecho era "una puercada", que no tenían que hacer esa mierda y que él no sabía que ellos harían una cosa como esa.[133] Mencionó que habló con "Juancho", un vecino suyo, y le contó sobre lo sucedido.[134] Luego, él fue a la guagua a verificar a Jimmy y a Dereck hasta que posteriormente la vecina llamó al 911.[135]

Estableció que luego llegó la Policía y demás oficiales, entre ellos el Agente Lafontaine González y el fiscal, quienes lo entrevistaron el día de los hechos.[136] Ese día, él les dijo que no había visto nada, que no sabía quiénes fueron, que fue un carro que les

---

[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*, pág. 152, líneas 1-20.
[129] *Id.*
[130] *Id.*, pág. 153, líneas 1-20.
[131] TEPO, pág. 153.
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*, pág. 154, líneas 1-18.

disparó y se fue.[137] Expresó que les dijo eso porque tenía miedo de que le pasara algo.[138] Tres días después, habló nuevamente con el Agente Lafontaine González, y como este "ya tenía unas cositas", no tuvo opción y le contó todo lo sucedido.[139]

El testigo continuó proveyendo una descripción de los visuales de las cámaras de seguridad del estacionamiento del Totem (Ballajá) y de casas aledañas que captaron los hechos que tuvo la oportunidad de observar, de igual forma detalló lo que presentaban las fotos admitidas como *Exhibits* por estipulación.[140] Reconoció en el video del estacionamiento de Ballajá, la guagua Odyssey de Jimmy, en la que él estaba sentado en el pasajero.[141] Identificó el vehículo de Font Meléndez.[142] De igual forma, atestó que él y Jimmy se dirigieron a saludar a Font Meléndez mientras Dereck, Mante y el Barbero esperaron en la escaleras.[143] Estipuló que surgía del video que la guagua Odyssey salió del estacionamiento, aproximadamente, a las 12:26 am, y que el Honda Accord de Font Meléndez salió a las 1:08 am.[144]

Con relación a los visuales tomados en la panadería La Francaise, corroboró que estuvo allí hablando por teléfono.[145] Describió los visuales de las cámaras de video de las residencias aledañas a la escena del crimen que mostraron lo ocurrido el día de los hechos. Específicamente, detalló que se observó cuando llegó la guagua Honda de Jimmy y se metió en la casa de la vecina para virar y dejarlos allí.[146] Agregó que se observaba cuando este aparece hablando con Jimmy y cuando posteriormente "Burruco" camina

---

[137] *Id.*, pág. 154, líneas 19-20 y pág. 155, líneas 1-5.
[138] *Id.*
[139] *Id.*, pág. 155, líneas 14-20.
[140] TEPO, pág. 160, líneas 8-20.
[141] *Id.*, pág. 160.
[142] *Id.*, pág. 170.
[143] Id.
[144] *Id.*, pág. 171, líneas 1-20.
[145] *Id.*, pág. 173, líneas 3-17.
[146] *Id.*, pág. 174, líneas 4-20.

hacia donde ellos estaban y dispara el arma de fuego.[147] Detalló que se observa cuando el Honda de Font Meléndez llega con "Burruco".[148] Finalmente, mencionó como se podía observar a "Burruco" correr y como, subsiguientemente, se monta en el carro de Font Meléndez.[149]

El Agente de Homicidios encargado de la investigación de los hechos, Carlos Lafontaine González[150] declaró que recibió la asignación de la investigación de un caso de doble asesinato ocurrido en el Barrio Lomas del Sol en Guaynabo.[151] Al acudir al lugar de los hechos observó una guagua Honda Odyssey, en cuyo interior estaban los cuerpos de las víctimas, uno estaba en la parte del chofer y el otro en la parte posterior del lado derecho.[152] Verificó las cámaras de seguridad de las residencias aledañas al lugar, y luego de percatarse que había una residencia con cámaras, dialogó con los propietarios para ocupar el video.[153]

En la escena del crimen entrevistó a López Rivera, ya que el Agente Vélez le dijo que él era la persona que estaba con los dos jóvenes asesinados ese día.[154] Este le dijo que no sabía quién había disparado, que había visto un Honda, color negro, de un tal "Carlitos" (Font Meléndez) en la escena, que era amigo suyo. También le dijo que observó a una persona con un arma en las manos y que él se fue para la parte de atrás del vehículo y luego para el patio de la residencia a esconderse.[155] Para obtener más información, lo citó a la Comandancia ese mismo día a las 11:00am.[156]

---

[147] *Id.*, pág. 175, líneas 1-20 y pág. 176, líneas 1-20.
[148] *Id.*, pág. 177, líneas 10-20.
[149] TEPO, pág. 179, líneas 1-5.
[150] TEPO, pág. 224, líneas 1-20.
[151] *Id.*
[152] *Id.*, pág. 226, líneas 1-20.
[153] *Id.*
[154] *Id.*
[155] *TEPO,* pág. 226.
[156] *Id.*, pág. 228, líneas 11-20.

En la Comandancia este le dio detalles de lo que hizo ese día con los occisos y otras personas más, a saber: (1) que fueron a la playa, al Viejo San Juan, a la panadería La Francaise, Lomas del Sol; (2) que el acusado fue al Viejo San Juan, y se estacionaron en Ballajá, que vio el vehículo de Font Meléndez y que este estaba con "Burruco"; (3) que fue a donde ellos con Jimmy y los saludó; y (4) que cuándo salieron del Viejo San Juan se fueron para el 24 Market, pero como estaba muy lleno no se detuvieron.[157] El testigo identificó a Font Meléndez en corte abierta.[158]

Estableció que López Rivera le detalló que fueron a la panadería, compraron unas cosas, salieron para el lugar donde residía en Lomas del Sol, que se estacionaron en el lugar, y que luego vio cuando la persona que subió les disparó a los dos jóvenes.[159] No obstante, contó que ese día no le dio el nombre de Font Meléndez, ni el de "Burruco".[160] Con la información que le proveyó López Rivera, corroboró los visuales de las cámaras del estacionamiento de Ballajá y corroboró los vehículos y las personas que estuvieron allí. Sostuvo que, a través del sistema de la Policía, supo que la Honda Odyssey, tablilla HLR-221, pertenecía al padre de Jimmy, que también se llamaba Jimmy Adorno y el Honda, color negro, tintado, tablilla JBP-721, le pertenecía a Madeleine Meléndez Pérez.[161]

Continuó relatando que, el 11 de marzo de 2020 fue nuevamente donde López Rivera y confrontó su testimonio a la luz de los visuales de Ballajá, La Francaise y el de la residencia.[162] Afirmó que le dijo que el carro Honda Accord era de Font Meléndez y que le contó todos los hechos ocurridos durante el día.[163] **En**

---

[157] TEPO, pág. 229, líneas 7-12.
[158] *Id.*
[159] *Id.*, pág. 230, líneas 1-20.
[160] *Id.*
[161] *Id.*, pág. 231, líneas 1-12.
[162] *Id.*, pág. 232, líneas 1-20.
[163] *Id.*

**particular, mencionó que le habló sobre las llamadas entre él y Font Meléndez, donde este último le dijo que "Burruco" estaba buscando a Dereck para matarlo**. Para evitar problemas, López Rivera le dijo que iba a salir a buscarlo, pero alegadamente este le mintió al decirle que Dereck se había ido.[164] Apuntó que Christian le dijo que estaban estacionados frente a su residencia y vio cuando "Burruco" iba subiendo la cuesta, llegó, se extrajo algo de la espalda y comenzó a disparar hacia Jimmy y Dereck.[165] **Indicó que López Rivera le dijo que se escondió, y al rato vio el carro de Font Meléndez que se detuvo en un reductor de velocidad y "Burruco" se montó en el vehículo, cerró la puerta y se fueron**.[166]

Planteó que luego de percatarse que en la dirección que tenían como la residencia de Font Meléndez se encontraba el Honda Accord, procuró una orden de allanamiento para buscar material delictivo con relación al caso.[167] Añadió que, en la propiedad ocuparon una libreta, una maleta, un celular y el Honda Accord que posteriormente fue llevado a ICF para un análisis de huellas, transferencias de sangre, entre otras cosas.[168] Agregó que también se encontró una mancha en una de las gavetas del dash.[169]

De otra parte, confirmó que "Burruco" se encontraba al momento del juicio desaparecido y trabajaba, a la fecha de los hechos, en el punto el barrio Tomé en Guaynabo, vendiendo drogas para la organización de Masa.[170] De acuerdo con su investigación, se trató de una muerte planificada entre Font Meléndez e Israel Martínez Díaz, alias "Burruco".[171] **Explicó que concluyó lo**

---

[164] *Id.*, pág. 233, líneas 1-20.
[165] *Id.*, pág. 234.
[166] *Id.* y pág. 235, líneas 1-20.
[167] *Id.*
[168] TEPO, pág. 235.
[169] *Id.*, pág. 239.
[170] *Id.*, pág. 243, líneas 9-20.
[171] *Id.,* pág. 244, líneas 1-20.

**anterior debido a las comunicaciones que estos tuvieron con López Rivera el día de los hechos, en las que le preguntaron dónde estaban, para donde iban y qué estaban haciendo.**[172] Mencionó que Jimmy trabajaba montando tarimas y vendía drogas.[173] Es por esto que, con relación al asesinato, opinó que el mismo fue motivado por las ventas de marihuana que hacía Jimmy.[174] Destacó que Dereck no trabajaba, pero que previamente había sido arrestado en un residencial de Guaynabo por vender sustancias en un punto de drogas.[175]

Como octavo testigo, declaró el Sr. Gerardo Maldonado Rodríguez. Atestiguó que conocía a Font Meléndez y a su mamá desde el 2009-2010 porque se mudaron cerca de su casa.[176] Explicó que Font Meléndez le lavaba los carros en el fin de semana y se hizo amigo de la familia.[177] Describió al acusado Font Meléndez como una persona respetuosa, trabajadora y afable.[178]

Durante el contrainterrogatorio, a preguntas del fiscal, expresó que no conocía a todas las amistades de Font Meléndez.[179] Sin embargo, estableció que tuvo una relación romántica con la madre del acusado y le apenaba mucho lo que estaba ocurriendo con él porque lo conocía.[180] Expresó que desconocía si Font Meléndez estaba involucrado en actividad delictiva, y que tampoco le constaba si fumaba marihuana o si tenía amistades del bajo mundo.[181]

Finalmente, el noveno y último testigo fue el propio acusado Font Meléndez. Testificó que tenía 20 años y al momento de los

---

[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.*, pág. 245, líneas 1-5.
[176] *Id.,* págs. 279-280.
[177] *Id.,* pág. 280.
[178] *Id.*
[179] *Id.,* págs. 281-282.
[180] TEPO, págs. 281-282.
[181] *Id.,* pág. 292.

hechos tenía 18 años.[182] En el 2019 jugaba baloncesto en el equipo de la escuela y trabajaba en el supermercado Ralph's de Humacao desde que salía de la escuela a las 3:00 pm hasta las 10:00 pm.[183] Conocía a López Rivera del barrio cuando vivía en Guaynabo, que a Jimmy y a Mante los conocía de la escuela, que a Barbero lo conoció a través de Dereck y que a "Burruco" lo conoció por un equipo de baloncesto.[184]

Testificó que fumaban marihuana cuando jangueaban y también en el lugar donde ocurrieron los hechos.[185] Casi siempre terminaban en el área de los hechos o en una calle más arriba, que le decían la casa de Angelito.[186] Negó haber estado involucrado en negocio de ventas de sustancias controladas o armas.[187] Indicó que conocía que Jimmy vendía marihuana ya que este le vendía a él, pero expresó que desconocía si Dereck traficaba drogas, sólo que sabía que las vendía.[188] Mencionó que conocía a "Burruco" por el equipo de baloncesto, pero que sabía que tenía un mundo aparte, pero conocía de su vida, aunque admitió que sí llegó a fumar con ellos.[189] Contó que luego de graduarse en el 2019 se fue a Estados Unidos a casa de su hermano y trabajó en una compañía de cortar grama desde junio hasta diciembre de 2019.[190] Durante ese tiempo ahorró y se compró el vehículo Honda Accord negro que fue posteriormente confiscado por la Policía.[191] Manifestó que a principio de 2020, una vez regresó a Puerto Rico, se matriculó en Huertas College para estudiar electricidad.[192]

---

[182] Id.
[183] Id., pág. 293, líneas 10-20.
[184] Id.
[185] Id., págs. 296-299.
[186] Id.
[187] Id.
[188] Id.
[189] Id.
[190] TEPO, págs. 296-299.
[191] Id.
[192] Id., pág. 300, líneas 17-20.

Relató que el día de los hechos habló con López Rivera y que este le indicó que estaba en la playa.[193] También le expresó que estaba, entre otras personas, con Dereck, y que sobre este le dijo que tuviera cuidado que él había escuchado que él tenía problemas.[194] Declaró que ese día no fue a la playa, pero que más tarde llamó a López Rivera y conversaron sobre el cumpleaños de Amalia, una compañera de la escuela, que se iba a celebrar en Papi Joe.[195] Indicó que "Burruco" también estaba invitado y lo llamó para ir al cumpleaños porque no tenía quien lo llevara.[196]

Admitió que estuvo en el estacionamiento de Ballajá con "Burruco" y que allí se les acercó el grupo de Jimmy para saludarlos.[197] Al llegar, dijo que fueron a la Perla a comprar unos tragos.[198] Posteriormente, "Burruco" y él fumaron marihuana y fueron al cumpleaños en Papi Joe, allí fueron cotejados por la seguridad del establecimiento.[199] Declaró que en el Papi Joe se encontraban Dereck y Jimmy.[200] Narró que vio como Burruco le pasó la hookah a Dereck y que este fumó de ella mientras hacían chistes y se reían entre ellos.[201] Sostuvo que todos bebieron esa noche juntos.[202] Aseveró que le preguntó a "Burruco" si él tenía problemas con Dereck y este le dijo que todo estaba resuelto. Sobre esto último, dijo que él no entró en detalles.[203]

Esa noche llamó a López Rivera para preguntarle qué iban a hacer y que este le indicó que irían al Twenty Four.[204] Luego, dijo que colgó la llamada y se fue a comer a un Burger King.[205] Contó

---

[193] *Id.,* pág. 303, líneas 12-20.
[194] *Id.*
[195] *Id.,* págs. 304-306.
[196] *Id.*
[197] *Id.*
[198] *Id.*
[199] *Id.,* págs. 307-308.
[200] *Id.,* pág. 309.
[201] *Id.,* pág. 310, líneas 5-20.
[202] TEPO, pág. 310, líneas 5-20.
[203] *Id.,* pág. 311, líneas 6-18.
[204] *Id.* pág. 312.
[205] *Id.,* pág. 313.

que, mientras comía, López Rivera lo llamó y le dijo que no iban para allá (refiriéndose a la Twenty Four), porque estaba muy lleno.[206] Añadió que le dijo que irían a echar gasolina y luego a la panadería.[207] Se dirigieron a fumar marihuana en el barrio Lomas del Sol, donde siempre fumaban, que fue precisamente el lugar de los hechos.[208]

Declaró que se estacionó donde siempre se estacionaba cuando iba al barrio, un poco retirado, frente a casa de una persona que él conocía que se llamaba Sidney.[209] Sostuvo que cuando estaban caminando hacia el lugar para fumar, él sabía que ellos habían llegado porque López Rivera se lo dijo.[210] Explicó que llegó al cruce de la calle, pero regresó a su carro para buscar la marihuana que se le había quedado.[211] Al estar en su carro, escuchó unos disparos y quedó paralizado.[212] En ese momento llamó a López Rivera y este le dijo que "Burruco" no tenía corazón, que había matado a Jimmy y a Dereck.[213] Expresó que desconocía que "Burruco" estuviera armado.[214] Luego de escuchar los disparos pasó por el lugar de los hechos y vio a "Burruco" en la carretera con dos armas de fuego.[215] Indicó que este le hizo señas para que parara y él se paró por miedo a que este lo matara a él también.[216]

Mencionó que mientras lo llevaba a su casa "Burruco" le dijo "cuidado con lo que vayas a decir".[217] Negó haber conocido que "Burruco" tenía un arma y mencionó que lo habían registrado en la discoteca y no la tenía.[218] En el recontrainterrogatorio dirigido por

---

[206] *Id.*
[207] *Id.*, págs. 313-314.
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Id.*, pág. 315, líneas 2-19.
[213] *Id.*, pág. 316.
[214] *Id.*
[215] TEPO, pág. 317.
[216] *Id.*
[217] *Id.*, pág. 318.
[218] *Id.*, pág. 319.

el Fiscal, negó haber sabido que "Burruco" tenía consigo armas de fuego esa noche.[219] Resaltó que de haberlo sabido, no lo montaba en su carro y afirmó desconocer de dónde "Burruco" había sacado las armas.[220]

D.

La evaluación desapasionada y objetiva de toda la prueba ofrecida y admitida en el juicio, tal y como fue creída por el Jurado, nos obliga a concluir que el Estado demostró más allá de duda razonable que Font Meléndez participó en los hechos que causaron la muerte a dos personas. La interrogante que aun debemos responder es, si la participación de Font Meléndez jugó un rol significativamente importante en los asesinatos, que justificara una convicción como coautor de los todos delitos juzgados. Veamos.

Es autor de la acción criminal aquel que principalmente causa el hecho delictivo, por lo que tiene dominio de este.[221] El Art. 44 del Código Penal[222] establece que se consideran autores:

- a) Los que toman parte directa en la comisión del delito.
- b) Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.
- c) Los que se valen de una persona inimputable para cometer el delito.
- **d) Los que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo.**
- e) Los que se valen de una persona jurídica para cometer el delito.
- f) Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.
- g) Los que a propósito ayudan o fomentan a que otro lleve a cabo conducta que culmina en la producción de un resultado prohibido por ley, siempre que

---

[219] *Id.,* págs. 342-343.
[220] *Id.*
[221] Luis E. Chiesa, *Autores y Cooperadores*, 79 REV. JUR. 283, 294 (1986).
[222] 32 LPRA § 5067.

actúen con el estado mental requerido por el delito imputado con relación al resultado.

De esta disposición se colige que, cuando concurren diferentes sujetos en el delito, la coautoría supone que cada interventor tiene dominio del hecho, ya que las contribuciones de cada uno resultan esenciales para lograr la consumación del delito.[223]

En lo relevante a este caso, en nuestro ordenamiento jurídico, la coautoría incluye el concepto del "cooperador necesario" o quien contribuye en los actos preparatorios a este.[224] El precitado inciso (d) responsabiliza como autores a quienes "**cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito y sin cuya participación no se hubiera podido cometer el delito**". Como puede apreciarse, existe un factor de prominencia en la ayuda o cooperación que se provea a "los autores directos del delito de manera consciente e intencional."[225] Como señala Dora Nevares Muñiz, bajo el nuevo paradigma, la coautoría como cooperación se satisface probando un "estado mental de **propósito** o con **conocimiento**, y que la contribución al delito consumado sea **significativa**, en vez de imprescindible".[226]

Claro, según pautado por nuestro más Alto Foro local, "no es indispensable que el acusado ejecute personalmente el acto; basta su presencia pasiva siempre que su responsabilidad como coautor pueda establecerse y probarse por actos anteriores, resultado de una conspiración o un designio común".[227] Para que se trate de coautoría, es necesario que exista un acuerdo o plan común previo para cometer el delito, que se participe en este y que **la contribución**

---

[223] Francisco Muñoz Conde y Mercedes García Arán, *Derecho Penal: Parte General* 435 (2007).
[224] *Id.*, págs. 301- 304.
[225] *Pueblo* v. *Santiago et al.*, 176 DPR 133, 144 (2009).
[226] Nevares-Muñiz, op. cit., pág. 356.
[227] *Pueblo* v. 176 DPR, pág. 144; *Pueblo* v. *Resto Laureano*, 206 DPR 963, 977 (2021).

**de cada individuo haya sido un eslabón importante en la producción de la ofensa**.[228]

Al sopesar si se trata de una cooperación necesaria, se debe evaluar si los actos facilitaron significativamente la comisión del delito, así como si eso representó un eslabón importante en el quehacer delictivo y, por ende, si se trató de una ayuda esencial.[229] "[L]a contribución material de cada coautor, sin importar cómo fue o en qué consistió, se consideran como un todo y el resultado lesivo total se le imputa a cada coautor por igual".[230] De lo anterior ser así, la pena por la comisión de los delitos se imputará por igual entre los distintos autores.

Por otro lado, se considera "partícipe" quien colabore intencionalmente en la realización de un hecho delictivo ajeno, sin tener control de este.[231] Entre las formas de participación se encuentran la inducción y la cooperación. El Art. 45 del referido Código establece que, son cooperadores los que, con conocimiento, cooperan mediante actos u omisiones **que no contribuyen significativamente** a la consumación del delito. Para que esa responsabilidad disminuida sea imputable, es necesario que la persona "actu[é] a propósito, con conocimiento, temerariamente o negligentemente con relación a un resultado o circunstancia prohibida por ley".[232] De manera que, compete demostrar que la persona imputada de delito incurrió en acciones producto de su voluntad, o que pudo prever.[233] La distinción del coautor cooperador del Art. 44 (d) del cooperador que no es coautor del Art. 45 es que la participación del primero es significativa (de mucho valor) en cuanto a la ejecución del delito, mientras que la participación del

---

[228] LUIS E. CHIESA APONTE, DERECHO PENAL SUSTANTIVO 81 REV. JUR. UPR 343, 192-193 (2013).
[229] *Pueblo* v. 206 DPR, pág. 977.
[230] *Pueblo* v. *Torres Feliciano,* 201 DPR 63, 85 (2018).
[231] Chiesa Aponte, op. cit., pág. 191.
[232] COD. PEN. PR art. 21, 33 LPRA § 5034.
[233] *Pueblo* v. *Sustache Sustache*, 176 DPR 250, 211 (2009).

cooperador es trivial, de poco valor, no es significativa para la consumación del hecho delictivo, pues si lo fuera entonces sería un autor.[234]

En ocasión de interpretar la hasta entonces novel figura del cooperador que no es coautor, el Tribunal Supremo en *Pueblo* v. *Sustache*,[235] destacó que la coautoría y la cooperación "son formas de intervención en un delito. No obstante, la primera es una forma de autoría, mientras la segunda es un tipo de participación".[236] Resaltó que, el concepto de coautor aplica a "aquellas personas que participan consciente e intencionalmente en la comisión de un delito", por lo que, "se requiere probar que los autores actuaron en concierto y común acuerdo, como parte de una conspiración o designio común. En otras palabras, se necesita establecer algún grado de consejo, incitación o participación directa o indirecta en el hecho punible".[237] Claro está, "[l]a mera presencia de una persona, durante la comisión de un delito, no lo convierte en coautor. Tampoco se considera coautor a aquella persona quien, sin saberlo, participa o coopera en la comisión de un delito".[238]

La figura del cooperador del Art. 45 se equipara al cómplice en aquellos escenarios en que no aplica el concepto de la coautoría.[239] Por tanto, son cooperadores "las personas que ayudan, pero no participan directamente en la planificación o ejecución del delito, ni tienen conocimiento pleno del mismo".[240] Es decir, "la actividad del cooperador. . .es secundaria o accesoria a la actividad del autor y sobre todo es una contribución "no significativa".[241] Distinto al cooperador que es coautor debido a su nivel de

---

[234] *Id.*
[235] *Pueblo* v. *Sustache Sustache,* 176 DPR 250 (2009).
[236] *Id.*, pág. 300.
[237] *Id.*, pág. 301.
[238] *Id.*
[239] *Id.*, pág. 305.
[240] *Id.*, pág. 304 (citas en el original omitidas).
[241] Nevares-Muñiz, op. cit., pág. 93.

involucramiento y participación necesaria, el cooperador que no es coautor, se expone a "una pena equivalente a la mitad de la pena del autor, hasta un máximo de diez (10) años".[242]

E.

Aplicada la norma expuesta a los hechos acaecidos en el presente caso, es obligatorio concluir que, como hizo el Jurado, de la prueba circunstancial y la demás evidencia directa puede inferirse razonablemente que Font Meléndez cooperó en la comisión del delito en calidad de coautor y no de cooperador que no es coautor. Elaboremos.

El testigo López Rivera, quien conocía tanto a los occisos Jimmy y Dereck como al acusado Font Meléndez, fue consecuente en ubicar a Font Meléndez, antes, durante y posterior al hecho delictivo, junto al sujeto que realizó los disparos mortales. Dicho testigo aseguró que, al informarle a Font Meléndez que estaba compartiendo con Jimmy y Dereck, Font Meléndez le advirtió que a Dereck lo estaban buscando para matarlo. Es decir, que Font Meléndez conocía del plan para asesinar, al menos, a uno de los infortunados.

Otro hecho de gran valor fue que, Font Meléndez, mientras estaba acompañado del sujeto que disparó contra las víctimas, insistentemente llamaba a López Rivera para preguntarle a dónde se dirigía junto con los infortunados, con el evidente propósito de saber la ubicación de las potenciales víctimas del crimen. Con conocimiento de las intenciones de su acompañante Burruco de dar muerte a Dereck, Font Meléndez se encargó de mantenerse en contacto con el testigo para monitorear el paradero de las víctimas.

Finalmente, luego de que le disparara mortalmente a las víctimas, el testigo narró como el agresor se montó en el carro de

---

[242] 33 LPRA § 5068.

Font Meléndez y se marcharon. Luego de eso, Font Meléndez volvió a llamarlo para preguntarle si Jimmy y Dereck estaban muertos.

Creemos sin ambages, que, cualquier jurado razonable hubiera podido concluir que Font Meléndez participó del crimen como cooperador activo, contribuyendo significativamente en su comisión. Como hemos indicado, de la prueba directa y circunstancial ofrecida por el Ministerio Público, debidamente admitida por el tribunal y creída por el juzgador de los hechos, puede inferirse razonablemente, que la ayuda, asistencia o cooperación brindada por Font Meléndez en la realización del crimen, fue tan significativa que sin ella no se hubiera podido lograr el resultado delictivo.

Quedó demostrado que Font Meléndez conocía lo que su compinche Burruco se prestaba a hacer. Font Meléndez llamó en múltiples ocasiones al señor López Rivera, sabiendo que se encontraba con Jimmy y con Dereck y que a Dereck lo estaban buscando para matarlo. La prueba circunstancial demostró que era Burruco, con quien Font Meléndez estuvo acompañado todo el tiempo, el que tenía problemas con Dereck y quien buscaba a Dereck para ultimarlo. Aun sabiendo eso, Font Meléndez, no solo llamó insistentemente a López Rivera para monitorear la ubicación de los individuos que eventualmente fueron asesinados, si no que transportó a Burruco al lugar donde estaba Dereck, esperó a que este disparara contra las víctimas y lo sacó de la escena. Siendo su participación de mucho valor en cuanto a la ejecución del delito, entonces no puede hablarse de mera presencia.

Repetimos, cualquier Jurado razonable pudo inferir, como lo hizo el Jurado que juzgó la causa, que la conducta previa, concomitante y posterior al crimen de Font Meléndez, obedeció a un plan común con Burruco para cometer los delitos imputados. No podemos subvertir la determinación fáctica a la que llegó el Jurado,

de que la participación de Font Meléndez fue de tal naturaleza que, sin ella, el delito no se hubiera consumado.

IV.

Es cuanto menos inmeritorio el argumento esgrimido por Font Meléndez en su señalamiento E, en el sentido de que el consumo de alcohol y marihuana por parte de Burruco provocó en este una perturbación mental y emocional suficiente que le beneficia a él, para efectos de reducir la gravedad del delito a un asesinato atenuado.

Aunque nuestro ordenamiento penal permite fallos o veredictos por delitos distintos al imputado, "el delito menor debe estar comprendido en el mayor por el cual se acusa y que los hechos expuestos para describir la comisión del delito mayor deben contener las alegaciones que son esenciales para constituir una imputación por el menor".[243] Se considera que un delito menor está incluido en el mayor, cuando "todos los ingredientes legales del *corpus delicti* del delito menor [están] en el mayor; el delito menor debe ser parte de hecho, del mayor, además de estar enmarcado dentro de la definición legal del mayor como parte del mismo".[244]

Cónsono con lo anterior, para que proceda instrucción "es necesario que exista evidencia sobre la cual el Jurado pueda inferir razonablemente que el acusado es culpable del delito inferior".[245] La evidencia a esos fines tiene que haber sido admitida, y de tal naturaleza que, de ser creída por el jurado, sería suficiente como cuestión de derecho penal sustantivo -no como cuestión de hechos o credibilidad de testigos reservada al jurado, para que el jurado emita un veredicto de conformidad.[246] Ergo, actúa correctamente un

---

[243] *Pueblo* v. *Soto Molina,* 191 DPR 209, 219 (2014); *Pueblo* v. *Ramos López*, 85 DPR 576 (1962).
[244] *Pueblo* v. *Concepción Sánchez,* 101 DPR 17, 20 (1973).
[245] *Pueblo* v. *Negrón Ayala,* 171 DPR 406, 415 (2007).
[246] ERNESTO L. CHIESA APONTE, DERECHO PROCESAL PENAL DE PUERTO RICO Y ESTADOS UNIDOS, COLOMBIA 332 (1992).

juez que deniega instruir al jurado sobre delitos menores incluidos si la evidencia, aun pudiendo ser creída por el Jurado, resulta insuficiente en derecho para establecer la comisión del delito.[247]

De eso se queja precisamente Font Meléndez mediante este señalamiento de error. Sostiene que debió impartirse la instrucción sobre el Asesinato Atenuado. Sin embargo, nada hubo en la prueba admitida que justificara la pretendida instrucción. Nos explicamos.

El Art. 95 del Código Penal,[248] define el tipo delictivo de Asesinato atenuado, como "toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia". Si bien comparte los elementos objetivos y subjetivos del Asesinato en primer y segundo grado, bajo esta modalidad del asesinato la pena se atenúa debido a que la muerte fue producto de una súbita pendencia o de una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable".[249] La circunstancia atenuante consiste en "que el acto del acusado fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta".[250] La provocación previa, solo aplicable a la modalidad de perturbación emocional suficiente, "tiene que ser aquella de tal naturaleza que haga perder el dominio de [una persona] de temperamento corriente[,] obligándol[a] a actuar por el impulso producido por [esa] notable provocación, sin la debida reflexión y sin formar un determinado propósito".[251]

---

[247] *Pueblo* v. 171 DPR, pág. 416.
[248] 33 LPRA § 5144.
[249] DORA NEVARES-MUÑIZ, CÓDIGO PENAL DE PUERTO RICO 160 (2019); Véase también *Pueblo* v. *Rivera Alicea,* 125 DPR 37, 46 (1989).
[250] *Id.*
[251] *Pueblo* v. *López Rodríguez,* 101 DPR 897, 900 (1974); *Pueblo* v. 125 DPR, pág. 47.

En este caso, no existe un ápice de evidencia que sostenga que Burruco padeció de un estado de perturbación mental y emocional al momento de disparar contra las víctimas. Por el contrario, tanto Font Meléndez como Burruco se tomaron el tiempo necesario para ejecutar con éxito el plan de matar a Jimmy y a Dereck. Aunque el periodo de enfriamiento ya no es un criterio para descartar el grado atenuado del asesinato, en este caso no hubo base en la prueba para que se pudiera inferir que, al momento del hecho, Burruco estuviera bajo un estado de perturbación mental y emocional suficiente que redujera la gravedad del delito. Ello así, no existe circunstancia atenuante que beneficie a Font Meléndez como coautor del hecho, al cooperar significativamente con Burruco en el crimen.

V.

En su planteamiento de error G, Font Meléndez señala que no podía declarársele culpable por el delito de Asesinato en primer grado bajo el inciso (d) del Art. 93 del Código Penal 2012, si se le absolvió de los cargos relacionados con la Ley de Armas. Su planteamiento es totalmente inmeritorio. Elaboremos.

De entrada, destacamos que, nada en nuestro ordenamiento jurídico invalida un veredicto por ser inconsistente.[252] Por el contrario, "de ordinario [,] no constituye error que dé lugar a la revocación de una convicción el mero hecho de que el jurado que intervenga en un proceso particular emita, respecto a diferentes pliegos acusatorios, veredictos que no guardan absoluta consistencia lógica entre sí".[253] En *Pueblo* v. *Medina Ocasio*,[254] el Tribunal Supremo señaló que, con o sin explicación, el jurado tiene la prerrogativa para emitir veredictos que no necesariamente

---

[252] *Pueblo* v. *Miró González*, 133 DPR 813 (1993).
[253] *Pueblo* v. *Gómez Nazario*, 121 DPR 66, 75(1988); Véase además *Pueblo* v. *Cabán Torres*, 117 DPR 645, 658 (1986).
[254] *Pueblo* v. *Medina Ocasio*, 98 DPR 302, 305 (2022).

guarden consistencia lógica. Explicó el máximo foro judicial, que, "[u]na de las razones por las cuales no se requiere que los veredictos del jurado sean consistentes es que se reconoce la realidad de que los jurados a veces atemperan la ley a su propio sentido de justicia y así atemperada la aplican. No estamos diciendo que ésta sea una buena práctica; sólo estamos reconociendo esa realidad".[255] En opinión del profesor Chiesa Aponte:

> [L]a tolerancia a los veredictos contradictorios se explica, tal vez, por razón de que[,] de prevalecer la lógica, con efecto de exigencia de consistencia, con frecuencia habría que anular veredictos de inocencia, lo que no es posible constitucionalmente, ni deseable. El acusado que reclama lógica jurídica probablemente se encontraría en peor situación si prevalece la lógica. Una instrucción prohibiendo veredictos contradictorios podría llevar al jurado a condenar al acusado por todos los cargos imputados, al no tener la opción de absolver por alguno de ellos y estimar que el resultado no puede ser total inmunidad.[256]

A la luz de esta clara doctrina, no le asiste la razón a Font Meléndez al solicitarnos la revocación del veredicto del Jurado basado en que este fue inconsistente al declararlo culpable de los asesinatos y absolverlo de la Ley de Armas de Puerto Rico de 2020. Ciertamente la absolución en las infracciones a la Ley de Armas no invalida los dos veredictos de asesinato en primer grado.

## VI.

Mediante sus señalamientos de error A y B, Font Meléndez plantea que, el Tribunal de Primera Instancia incidió al instruir al Jurado sobre la modalidad de acecho del Art. 93(a) a pesar de que las acusaciones le imputaron la modalidad del inciso (d), relativa a disparar un arma de fuego desde un vehículo de motor. También sostiene que, el Tribunal de Primera Instancia debió instruir al Jurado sobre la modalidad de inciso (d) porque fue la modalidad imputada. Examinemos la corrección de sus planteamientos.

---

[255] *Id.*, pág. 305.
[256] Ernesto L. Chiesa Aponte, Procedimiento Criminal y la Constitución: Etapa Adjudicativa 517 (2018).

A.

Nuestra Constitución establece que, todo acusado de delito grave, o de un delito que apareje una pena de tal clasificación, tiene derecho a ser procesado por un jurado imparcial.[257] Ese derecho constitucional, de inmensa valía para nuestra sociedad, implica que la culpabilidad o no culpabilidad del imputado, será determinada por un grupo representativo de la comunidad.[258]

En los casos que el acusado escoja ser juzgado por un Jurado, le corresponde a este último "ser el juzgador de los hechos" rindiendo un veredicto unánime.[259] La función del jurado es recibir la prueba, adjudicar los hechos solo a base de esa prueba y luego aplicar a esos hechos el derecho que corresponde, conforme a las instrucciones que imparta el juez.[260] Ello implica que el Jurado tendrá "la última palabra no solo en cuanto a la culpabilidad o inocencia del imputado, sino que, además, será quien determine. . . el delito específico, o el grado de este, por el cual el imputado debe responderle a la sociedad".[261]

En vista de que el jurado, de ordinario, está compuesto de personas inexpertas sobre las normas jurídicas vigentes en nuestro ordenamiento jurídico, las instrucciones constituyen el mecanismo procesal mediante el cual los miembros del jurado toman conocimiento del derecho aplicable al caso.[262] Como componente esencial del juicio,[263] el magistrado que preside el proceso tiene el

---

[257] CONST. PR art. II, §11; *Pueblo* v. *Agudo Olmeda*, 168 DPR 554 (2006); *Pueblo* v. *Negrón Ayala*, 171 DPR 406 (2007); *Pueblo* v. *Echevarría Rodríguez I*, 128 DPR 299 (1991).
[258] *Id.*
[259] *Pueblo* v. *Torres Rivera II*, 204 DPR 288 (2020) (adoptando la norma enunciada por la Corte Suprema federal en *Ramos* v. *Louisiana*, 140 S.Ct. 1390 (2020) sobre que todo veredicto de culpabilidad tiene que ser por unanimidad); Véase también *Pueblo* v. 171 DPR, pág. 413 (2007).
[260] ERNESTO L. CHIESA APONTE. PROCEDIMIENTO CRIMINAL Y LA CONSTITUCIÓN: ETAPA ADJUDICATIVA 490 (2018).
[261] *Pueblo* v. *Cruz Correa*, 121 DPR 270, 277 (1988).
[262] ERNESTO L. CHIESA APONTE, DERECHO PROCESAL PENAL DE PUERTO RICO Y ESTADOS UNIDOS 130 (1992).
[263] *Id.*, pág. 501.

deber ineludible de instruir al jurado sobre el derecho aplicable al caso de forma clara, precisa y lógica.[264]

En su dimensión particular, es necesario instruir al jurado sobre los posibles veredictos, compatibles con la evaluación de la prueba que pueda hacer el jurado.[265] Entre ellas, siempre tiene que incluirse la instrucción de no culpable.[266] Por ello, una adecuada y correcta instrucción al jurado debe cubrir los elementos de los delitos comprendidos en el delito imputado; los elementos esenciales de las defensas si el pliego acusatorio y la prueba lo justifica, y cualquier punto de derecho que, bajo alguna teoría razonable sea pertinente, aunque la prueba sea débil, inconsistente o de dudosa credibilidad.[267] Por ejemplo, si la acusación y la prueba lo justifican, hay que impartir instrucciones sobre causas de justificación, causas de exculpación, error de tipo, entrampamiento, conducta insignificante, el efecto de embriaguez o intoxicación, los elementos de la tentativa y los principios de participación en el delito, sean autores o cooperadores.[268]

Errores al impartir u omitir impartir determinada instrucción, podría estar reñido con el derecho del acusado a un juicio justo, amparado por el debido proceso de ley y por un jurado imparcial, según establecido en la Sexta Enmienda de Estados Unidos.[269] Esto es así "porque corresponde al [J]urado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél

---

[264] *Pueblo* v. *Andrades González*, 83 DPR 849 (1961).

[265] *Pueblo* v. *Reyes Acevedo*, 100 DPR 703, 117 (1972). En este caso, el jurado rindió veredicto por asesinato en segundo grado, pero el Tribunal Supremo revocó por el error de no incluir el veredicto de no culpable entre los veredictos posibles. El tribunal juzgó que esta instrucción "tenía el efecto de negarle al jurado la facultad que tiene, y que no puede restringírsele, limitársele, o negársele en forma alguna, de apreciar toda la prueba y no creer la prueba de cargo, y en tal virtud, de rendir un veredicto de no culpable".

[266] *Pueblo* v. *González Colón*, 110 DPR 812 (1981).

[267] *Pueblo* v. *Lorio Ormsby I*, 137 DPR 722 (1994) y su reconsideración 137 DPR 977 (1995); *Pueblo* v. *Bonilla Ortiz*, 123 DPR 434 (1989); *Pueblo* v. *Prados García*, 99 DPR 384 (1970).

[268] Chiesa Aponte, *supra* nota 246, en la pág. 503.

[269] *Id.*; CONST. EE. UU., Enmienda VI, LPRA, Tomo 1.

aquilate la prueba y determine los hechos."[270] Si el foro primario relega de su obligación y no informa al Jurado, por medio de las correspondientes instrucciones -sobre los aspectos generales del derecho y de las defensas propuestas por las partes- ello tendría la consecuencia de que la convicción pueda ser revocada.[271] Cualquier defecto en la instrucción que resulte en perjuicio a los derechos constitucionales del acusado podría acarrear la revocación del caso en apelación.[272]

En tal sentido, el efecto de error en las instrucciones al jurado se rige por normas similares al efecto de error en la admisión o exclusión de evidencia.[273] La Regla 137 de Procedimiento Criminal dispone que, "ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales **antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud**".

Según interpretado por el Tribunal Supremo, "dicho principio . . .requiere que la defensa formule sus objeciones respecto a las instrucciones oportunamente. . .para así brindarle a ese foro la oportunidad de corregir los errores que pueda haber cometido".[274] Las objeciones o instrucciones adicionales pueden solicitarse "fuera de la presencia del jurado". Si no se objeta la instrucción oportunamente, se activa una presunción de corrección que constituye una renuncia a traer en apelación un señalamiento de error relativo a dichas instrucciones.[275] Esto implica que, en el recurso que impugna el veredicto de culpabilidad, no se puede

---

[270] *Pueblo* v. *González Colón*, 110 DPR 812, 815 (1991).
[271] *Pueblo* v. *Negrón Ayala*, 171 DPR 406, 414 (2007).
[272] DORA NEVÁREZ MUÑIZ, SUMARIO DE DERECHO PROCESAL PUERTORRIQUEÑO 188 (2014).
[273] *Id.*
[274] *Pueblo* v. *Ortiz Martínez*, 116 DPR 139, 151 (1985).
[275] *Pueblo* v. *Jiménez Hernández*, 116 DPR 632, 638 (1985).

levantar por primera vez un señalamiento de error sobre instrucción impartida u omitida.[276]

Aunque en múltiples ocasiones se ha rechazado atender planteamientos de error en las instrucciones al jurado por no haberse objetado oportunamente,[277] por excepción a esta norma general, como foro revisor podemos obviar el requisito de que se plantee el error durante el juicio, si entendemos que de no atender el error se afectarían los derechos fundamentales del acusado, que, de no corregirlo, entrañaría un fracaso de la justicia.[278]

Ampliando lo anterior, como regla general, un error, ya sea por razón de una instrucción errónea o por razón de la omisión de una instrucción que debió ser impartida, no acarrea, de suyo, la revocación de un veredicto de culpabilidad, sino que está sujeto a ser considerado *harmless error.*[279] Aun en los casos en que se hubiere cumplido con el requisito de la objeción oportuna durante el juicio y estimáramos que, en efecto se cometió el error, ello no implica una revocación automática de la convicción.[280]

En tal sentido, la Regla 105 (B) de Evidencia codifica la norma expuesta en el normativo *Chapman* v. *California,*[281] en que se abandonó la visión de que la ocurrencia de errores conllevaba la revocación automática del dictamen. En cambio, se estableció que, si el error cometido es una lesión a un derecho constitucional, no procede aplicar el estándar de *harmless error,* a menos que el

---

[276] Chiesa Aponte, *supra* nota 246, en la pág. 511.

[277] *Pueblo* v. *Rivera Carmona,* 108 DPR 866, 872 (1979); *Pueblo* v. *Acevedo González,* 95 DPR 355 (1967); *Pueblo* v. *Del Valle,* 91 DPR 174, 179 (1964); *Pueblo* v. *Negrón,* 79 DPR 296 (1956); *Pueblo* v. *Lampón,* 78 DPR 109, 115 (1955); *Pueblo* v. *García,* 78 DPR 396, 406 (1955); *Pueblo* v. *Cirino,* 69 DPR 525, 532 (1949); *Pueblo* v. *Millón,* 66 DPR 243, 253 (1946).

[278] *Pueblo* v. *Frometa Hazoury,* 140 DPR 18, 21 (1966).

[279] Chiesa Aponte, *supra* nota 246, en la pág. 510-512 (citando a *Chapman* v. *California,* 386 US 18 (1967)).

[280] *Id.* Nuestro Tribunal Supremo ha sugerido que será una buena práctica que las instrucciones al jurado se ajusten a las instrucciones de Manual de Instrucciones al Jurado vigente. *Pueblo* v. *Velázquez Caraballo,* 110 DPR 369 (1980). Esto, en aras de lograr obtener mayor uniformidad en la administración de la justicia penal. El apartarse del Manual de Instrucciones, junto con otros errores, podría ser motivo de revocación de un caso en apelación. *Pueblo* v. *Mangual Hernández,* 111 DPR 136 (1981).

[281] *Chapman* v. *California,* 386 US 18, 24 (1967).

tribunal apelativo se convenza, más allá de duda razonable, que, de no haberse cometido el error, lo más probable es que se hubiera llegado al mismo fallo o veredicto. Distinto al análisis de *harmless error*, bajo este tipo de error, es el Estado el que tiene que convencer al tribunal de apelaciones, más allá de duda razonable, de que el error no fue un factor sustancial en el resultado del caso.[282]

Analíticamente hablando, como foro apelativo debemos examinar si en la mente del jurado promedio, de no ser por la errónea admisibilidad de evidencia, el caso del fiscal hubiera sido significativamente menos persuasivo. Ahora bien, para evaluar si el error no fue perjudicial más allá de duda razonable, tenemos que examinar el récord en búsqueda de otra evidencia contundente sobre la culpabilidad. Es decir, "[w]here a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed".[283] Pero cuando tengamos serias dudas sobre el posible efecto del error en la determinación del juzgador, tenemos que tratar el error como uno que tuvo un efecto sustancial en el veredicto o fallo. Debemos tratarlo como un error perjudicial.

---

[282] *Pueblo* v. *Pellot Pérez*, 121 DPR 791 (1988); Véase también *Pueblo* v. *Ríos Álvarez*, 112 DPR 92 (1982); *Pueblo* v. *Rosaly Soto*, 128 DPR 729, 745 (1991). Ello es un poco diferente del derrotero adoptado por la corte Suprema Federal. Allí, el peso de la prueba ha pasado desde recaer sobre el Estado teniendo el ministerio fiscal que convencer al foro apelativo más allá de duda razonable que el error no tuvo efecto sustancial, a trasladarse a la defensa, teniendo esta que convencer a dicho foro que de no ser por el error se hubiese absuelto al acusado. *Rose* v. *Clark*, 478 US 570 (1986). Posterior a *Chapman* v. *California*, en *Harrington* v. *California*, 395 US 250, 254 (1969), el Tribunal Supremo de Estados Unidos pareció trasladar la carga de persuadir en estos casos. Siguió esta tendencia poco después en *Schneble* v. *Florida*, 405 US 427 (1972); Véase además *Rose* v. *Clark*, supra.

Basado en consideraciones prácticas, se trasladó el peso de la prueba de requerir al ministerio público demostrar mediante prueba más allá de duda razonable que el error no contribuyó al veredicto a exigir a la defensa probar que el error fue tan significativo que sin él, el acusado hubiera sido absuelto. Ahora, luego de que la defensa establezca que se cometió el error y que el mismo contribuyó decisivamente al veredicto o fallo, corresponde al Estado persuadir al tribunal apelativo que el error no fue perjudicial más allá de duda razonable. Es decir, el peso de la prueba se traslada al gobierno solo después que la defensa demuestre que de no haber sido por el error constitucional, el acusado no hubiera sido encontrado culpable.

[283] *Rose* v. 478 US, pág. 579.

La revocación de un veredicto por razón de instrucción errónea se justifica si: (1) si la instrucción omitida es correcta; (2) si esta no ha sido cubierta en otras instrucciones impartidas; y (3) si la omisión priva seriamente al acusado de una defensa efectiva.[284]

Un último elemento dentro de la amplia doctrina de revisión de errores en la admisión de evidencia es el llamado error estructural. Los llamados errores estructurales son aquellos tan perjudiciales que provocan la revocación automática de la condena. Su patente gravedad no permite la aplicación de la doctrina de *harmless error*. Sobre esto, el Profesor Ernesto L. Chiesa Aponte menciona lo siguiente:

> Si se trata de un error de rango constitucional, para confirmar el veredicto se requiere que el tribunal apelativo quede convencido más allá de duda razonable de que el veredicto hubiera sido el mismo. Pero si se trata de un error en la instrucción sobre lo que significa prueba más allá de duda razonable, con efecto de diluir o rebajar la carga probatoria del fiscal para un veredicto de culpabilidad, el error se considera estructural y hay que revocar y ordenar un nuevo juicio; no es posible *harmless error*.[285]

Se han denominado errores estructurales: 1) la privación del derecho a abogado; 2) un adjudicador parcializado; 3) denegación del derecho a representación por derecho propio; 4) denegación a un juicio público; 5) instrucciones incorrectas al jurado sobre la necesidad que se pruebe el delito más allá de duda razonable; y 6) privación del derecho constitucional a abogado en la primera apelación.

No se consideran errores estructurales instrucciones erróneas al jurado, a menos que las mismas incidan en la necesidad de que se pruebe más allá de duda razonable el delito. Por ejemplo, se ha determinado que no constituye un error estructural omitir un elemento del delito al jurado, como sería, el elemento de malicia o

---

[284] *Pueblo* v. *Sáenz Forteza*, 100 DPR 956 (1972); Véase además *Pueblo* v. *Negrón Vélez*, 96 DPR 419, 431 (1968).
[285] Chiesa Aponte, *supra* nota 246, en la pág. 511 (citando *Sullivan* v. *Louisiana*, 508 US 275 (1993)).

intención, o dar una descripción errónea de uno de los elementos del delito. La determinación de si este error no fue perjudicial será en circunstancias excepcionales, porque el tribunal revisor está confiado que el mismo no jugó algún papel en el veredicto del jurado.[286]

B.

Examinemos, a la luz del estándar de revisión judicial reseñado, si constituyó error que acarrea la revocación del dictamen condenatorio, no instruir al Jurado sobre la modalidad de Asesinato en primer grado estatuida en el Art. 93 (d) del Código Penal,[287] e impartir instrucciones relacionadas al Art. 93(a) del Código Penal.[288]

Para Font Meléndez, el Juez que presidió el juicio debió instruir al Jurado sobre la modalidad del inciso (d) del Art. 93, de ocasionar la muerte a un ser humano al disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado. Basa su argumento en que era esa la modalidad enunciada en el acápite del pliego acusatorio correspondiente a la disposición infringida.

Conforme explicamos en extenso en el acápite III de esta *Sentencia,* la calificación del delito consignada en el título de la acusación no es lo determinante para propósitos del debido proceso de ley, sino el contenido del pliego, donde se alegan los hechos que específicamente se le imputan. Por tanto, no instruir al Jurado sobre la modalidad contenida en el título, distinta a la que se imputa en el cuerpo de la acusación, no constituye un error que invalide el veredicto sobrevenido.

Basados en la misma premisa, razonamos que no erró el Juez al instruir al Jurado sobre la modalidad clásica estatuida en el Art.

---

[286] *Sullivan* v. *Louisiana,* 508 US 275, 281 (1993).
[287] 33 LPRA § 5142.
[288] *Id.*

93(a) del Código Penal, pues fue la modalidad imputada en el cuerpo de los pliegos acusatorios. En ambas acusaciones se alegó que Font Meléndez "a propósito y con intención criminal premeditadamente y mediante acecho, dio muerte [a un] ser humano. . ., consistente en que utilizando un arma de fuego color negra, le hizo varios disparos al cuerpo ocasionándole la muerte". Cumplido de esta forma el requisito de notificación adecuada de la naturaleza de la conducta delictiva imputada, era esta la instrucción obligada a dar al Jurado. De hecho, al así hacerlo el juez, ninguna de las partes objetó la instrucción. Se activó de esta forma la presunción de corrección de la instrucción, según reseñamos previamente. Los errores imputados no se cometieron.

VII.

Por los fundamentos antes expuesto, se *confirma* la sentencia apelada en toda su extensión.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>Secretaria del Tribunal de Apelaciones